IN THE MATTER OF THE APPLICATION OF HACKENSACK WATER COMPANY FOR ADDITIONAL WATER SUPPLY FROM TWO NEW WELLS IN UPPER SADDLE RIVER, BERGEN COUNTY, NEW JERSEY.

HACKENSACK WATER COMPANY, RESPONDENT, v. BOROUGH OF UPPER SADDLE RIVER AND VILLAGE OF RIDGEWOOD, APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued June 14, 1965—Decided July 8, 1965.

Before Judges KILKENNY, GOLDMANN and LEWIS.

*Mr. Benedict W. Harrington* argued the cause for appellants (*Messrs. Kessler, Kessler & Harrington,* attorneys).

*Mr. Samuel W. Zerman* argued the cause for respondent (*Messrs. Milton, Keane & DeBona,* by *Mr. Joseph Keane,* of counsel).

*Mr. Arthur J. Sills,* Attorney General of New Jersey, by permission of the Court filed a brief on behalf of intervenor Division of Water Policy and Supply (*Mr. Alan B. Handler,*

First Assistant Attorney General, of counsel and on the brief; *Mr. Richard F. Aronsohn*, Deputy Attorney General, on the brief).

The opinion of the court was delivered by

KILKENNY, J. A. D. This is an appeal by Borough of Upper Saddle River (hereinafter "borough") and Village of Ridgewood (hereinafter "village") from a determination of Division of Water Policy and Supply, in the Department of Conservation and Economic Development, granting an application by Hackensack Water Company for approval of plans for diverting not to exceed an average of two million gallons of water daily during any month, for the purpose of obtaining an additional source of water supply from two wells. The point of the proposed diversion is located along the west bank of Saddle River and in the vicinity of Lake Street, between East Saddle River Road and West Saddle River Road, in the Borough of Upper Saddle River, Bergen County. In granting the application, certain conditions were imposed, as hereinafter noted.

The borough and village contend that the action of the Water Policy and Supply Council (hereinafter "Council") was not in accord with the statutory requirements, *R. S.* 58:1–20, failed to consider public and private interests below the point of diversion, and was violative of procedural due process. In order to put these issues in proper focus, we summarize the principal facts adduced at the hearings before the Council, in which the water company, the borough and the village, as well as some other objectors who have not appealed, participated.

Hackensack Water Company (hereinafter "Hackensack") services 58 municipalities in Bergen and Hudson Counties with a total population of over 750,000 persons. On October 23, 1963 Hackensack applied to the Council for permission to divert an average of two million gallons of water per day (MGD) from the two wells mentioned above. Although these wells are not located within the area served by Hackensack, it

was claimed that this additional supply was required by the company to meet the present and future needs of its customers. After due notice had been given to interested parties and municipalities, a public hearing was held on the application before a panel comprised of members of the Council.

At the hearing, Hackensack presented evidence of the public necessity for the diversion. It was demonstrated that the constant growth in the population of the area served by the company will place an ever-increasing burden upon it which can only be met by tapping every available source of supply. Evidence was also introduced to show that the proposed wells have been constructed safely, will be free from contamination and will have no adverse effect upon existing wells in the area.

Mr. R. M. Leggette testified as an expert geologist for Hackensack. As the result of various tests conducted at the wells, he concluded that the water pumped from the wells is derived partly from subsurface sources and partly from infiltration from Saddle River, located less than 50 feet away. Leggette also prepared a chart of the amount of water which flows daily past the point where the two wells are located. This chart indicated that the flow never falls below 2 MGD. Ninety per cent of the time the flow is at least 4 MGD. Half of the time the flow is over 10 MGD; and ten per cent of the time the flow reaches 25 MGD. From these figures the witness concluded that "even if all the water pumped from wells were derived by infiltration, the flow of the stream is adequate to support a development of 2 million gallons per day."

The municipalities which objected to the proposed diversion offered evidence that for the summer of 1957 the average river flow past the location of the wells was only 2.8 MGD. One of the objectors' experts indicated that it would not be unusual for Hackensack's wells to draw as much as 50% of their water from the river. He was, therefore, of the opinion that during the dry season the output of 2 MGD by the wells "could have very significant effects" upon the river flow. On the basis of data which showed that on one occasion the flow

of Saddle River had fallen to only 1.5 MGD, he concluded that the use of the wells under such condition would "literally dry up the stream."

The objectors also introduced evidence of the importance of maintaining an adequate flow in Saddle River. Ridgewood, which is downstream from the proposed wells, has five municipal wells in the Saddle River basin. Borough of Saddle River, which is immediately downstream from the Borough of Upper Saddle River, depends upon the river for water for fire fighting. The fire insurance ratings for the Borough of Saddle River are contingent upon the maintenance of a minimum flow in the river of 500 gallons per minute, or 720,000 gallons per day. Similarly, the Borough of Upper Saddle River depends upon the river for water for fire fighting.

With the consent of all parties, the original hearing had been held before only two members of the Council. The later hearings were held before three members. At the conclusion of the case, the Chairlady of the hearing panel stated that "the testimony will be read and the members of this Board will make their recommendation to the full Council, and it will meet and make a determination and it will be published thereafter."

Accordingly, the Council members who heard the case made findings of fact and conclusions of law which were transmitted, together with copies of the transcript of the hearing, to the full membership of the Council. No copies of these findings, or of the recommendations which accompanied them, were transmitted to the parties in interest.

The hearing panel concluded that public necessity justified the utilization of the wells in question. Moreover, the construction of the wells was found to conform to safety and health requirements. Therefore, approval of the application was recommended. However, the panel found that the proposed diversion may cause a diminution of the flow of Saddle River and an interference with existing water supplies. Accordingly, approval of the application was recommended under the following pertinent conditions: (a) the wells may

divert no more than an average of 2 MGD of water; (b) diversion must cease when the natural flow of Saddle River, as measured at a point upstream from the wells, falls below 1.5 MGD; and (c) the approval shall be subject to review by the Council for possible future modifications in the public interest.

The full Council accepted the recommendations of the hearing panel and granted Hackensack's application. Although the determination of the Council made no specific finding on the question of the effect of the wells on the flow of Saddle River, its formal resolution granting the application noted that "the proposed diversion will not unduly injure public or private interests." Moreover, approval was granted subject to the conditions recommended by the hearing panel.

## I.

■ We turn first to the contention that the action of the Council was not in accord with the requirements of *R. S.* 58:1–20. To meet the criteria of this section, the proposed plans for water diversion must, (1) be justified by public necessity; (2) provide for proper and safe construction of facilities; (3) provide for the prevention of contamination; (4) insure that any resulting reduction in the dry-season flow of a stream will not produce unsanitary conditions or otherwise injure public or private interests; and (5) be just and equitable to municipalities and their inhabitants with regard to their present and future water needs.

■ Due to the important public service performed by water companies, the Council is urged to "make a reasonable effort to meet the needs of the applicant." *R. S.* 58:1–21. However, to insure compliance with the requirements of *R. S.* 58:1–20, the Council is empowered to condition the grant of an application upon the performance of such acts as will insure the enforcement of the statutory purpose. *R. S.* 58:1–21.

■ In reviewing the determination of the Council, we must be mindful of the broad discretionary powers which have been granted to that agency. Accordingly, the Council's

decision will not be set aside if supported by substantial evidence in the record. It is only where the determination of such an agency so departs from the record as to become arbitrary, capricious or unreasonable that we will step in and make our own evaluation. See *In re Plainfield-Union Water Co.*, 14 *N. J.* 296 (1954); *In re Hackensack Water Co.*, 41 *N. J. Super.* 408 (*App. Div.* 1956).

In the instant case, our examination of the record clearly discloses substantial evidence to support the Council's determination on four of the five statutory requirements. Indeed, the objectors do not really contest such findings. The real controversy surrounds the fourth requirement concerning the reduction of the dry-season flow in Saddle River.

After a proper evaluation of the evidence, the hearing panel concluded that the proposed diversion would have an adverse effect upon the flow of Saddle River. Accordingly, its recommendation of approval was conditioned upon the maintenance of a minimum flow of 1.5 MGD in the river upstream from the point of diversion.

Neither the determination of the full Council, nor its resolution, contains an evaluation of the evidence on this point. In fact, the determination does not even discuss the question of the flow of Saddle River. All the resolution contains is a conclusory statement that the diversion "will not unduly injure public or private interests." However, the Council's approval of the application did contain the conditions recommended by the hearing panel.

The objectors first claim that the omission of an analysis of the evidence on this point renders the Council's decision fatally defective. See *In re Plainfield-Union Water Co.*, 11 *N. J.* 382, 396 (1953). However, since the Council took an action identical to that recommended by the hearing panel, it would not be unreasonable to conclude that the Council concurred in the panel's findings on this point. Therefore, by incorporating into the Council's decision the panel's findings, which were in fact published with the decision, any formal defects in the Council's decision were thereby cured.

The objectors next contend that the conditions attached to the Council's approval of the application will not serve to protect the interests of municipalities located downstream from the point of diversion. As noted above, approval of the diversion was conditioned upon the maintenance of 1.5 MGD of water flow in the river *upstream* from the point of diversion. But the municipalities to be protected are located *downstream* from the point of diversion. There was undisputed evidence that, even though the wells drew a large portion of their water from subsurface sources, an appreciable percentage of their water will come from Saddle River. Therefore, it is apparent that the vital issue is the amount of minimum river flow to be maintained *below* the point of diversion.

Any difficulty in this area was removed at oral argument when Hackensack's attorney consented to a modification of the Council resolution which would condition approval of the diversion upon the maintenance of a minimum river flow of 1.5 MGD as measured at a point immediately below the site of the wells. Such a condition would insure that the Borough of Saddle River will receive its requirement of 720,000 gallons per day for fire protection. This condition would also satisfy the needs of Ridgewood. Although there was no specific testimony as to what amount of river flow is needed by Ridgewood, there was evidence that the average river flow at Ridgewood is greater than the flow at the point of diversion in Upper Saddle River. Moreover, there was testimony that Ridgewood's municipal wells can operate effectively as long as there is some water flow in Saddle River, however small. Therefore, the agreed-upon modification of the resolution will remove the probability of injury to downstream communities. See *Society for Establishing Useful Manufactures v. Board of Conservation and Dev.*, 90 *N. J. L.* 469 (*Sup. Ct.* 1917), affirmed 91 *N. J. L.* 718 (*E. & A.* 1918), where a similar condition was imposed concerning the downstream flow from a dam.

■ The objectors' final claim of error on the merits relates to the propriety of a grant of permission to Hackensack to divert an "average" of 2 MGD of water from the wells during any month. It is claimed that this allows the company to divert up to 62 million gallons of water per month without regard to any daily quota. Thus, on any given day the diversion of water may be far in excess of two million gallons, with resulting impairment of the flow of the river. We believe that the condition for the maintenance of a 1.5 MGD flow in the river removes the probability of injury. Since this condition insures a safe flow at all times, the operation of the wells cannot change the situation. Moreover, it should be noted that the term "average * * * during any month" appears on the printed application forms distributed by the Division of Water Policy and Supply. We may therefore surmise that the Division has found this to be the most practical way of measuring the *quantum* of distribution which it approves.

Finally, it should be noted that the Council's approval of the application is subject to review at any time in the public interest. Thus, if any problem has been overlooked, or if conditions should change, the objectors can always return to the Council for a redress of their grievances. This provision for future review is a wise one in that it destroys the possibility of permanent injury to any party as a result of the Council's resolution. Hackensack represents that each well will be equipped with a 1 MGD pump so that, even allowing for an overload, the variation of 2 MGD should not be substantial.

We conclude, therefore, that the statutory requirements for the approval of Hackensack's application were satisfied and that the conditions upon which the grant of water diversion was made are reasonable and in accordance with the statutory policy.

## II.

The objectors' other claim of error relates to the procedure followed by the Council. It is asserted that the Council's

reliance upon a secret report from the hearing panel constituted a denial of procedural due process.

As stated above, the hearing in this matter was conducted before a panel comprised of two (later three) members of the seven-member Council. At the conclusion of the hearings, this panel prepared findings of fact and conclusions of law. Copies of this report and a full transcript of the proceedings were distributed to the other members of the Council, together with a recommendation for favorable Council action on the application of the water company. After an examination of the transcript and the panel's findings, the full Council made a determination and adopted a resolution granting the application, as had been recommended by the hearing panel.

The objectors do not attack this form of procedure *per se.* See *R. S.* 58:1–8; *N. J. S. A.* 13:1B–49; *Borough of Chatham v. Board of Conservation and Dev.,* 107 *N. J. L.* 101, 104 (*E. & A.* 1930). But, in the instant case, the objectors claim error in that they were not furnished with copies of the hearing panel's findings and recommendations before the determination of the full Council. The objectors assert that this omission denied them procedural due process, since they had no opportunity to analyze and refute the findings before the full Council acted upon them. They charge, in effect, that this report of findings was a matter *dehors* the record and, therefore, improperly considered by the full Council. See *In re Plainfield-Union Water Co.,* 11 *N. J.* 382 (1953); *Pennsylvania R. R. v. New Jersey State Aviation Comm'n,* 2 *N. J.* 64 (1949); *Borough of Chatham, supra,* at *p.* 103.

The objectors' claim is based in essence upon *Mazza v. Cavicchia,* 15 *N. J.* 498 (1954). There a licensee was tried for alleged violations of the alcoholic beverage laws before a hearing examiner of the Division of Alcoholic Beverage Control. This examiner made findings of fact and conclusions of law which were transmitted to the Director of the Division, the ultimate deciding officer. Upon examination of the report and the transcript of the hearing, the Director suspended the party's license.

The licensee appealed on the ground that the failure of the Division to provide him with a copy of the hearing examiner's report amounted to a denial of procedural due process. This contention was rejected by the Appellate Division. Judge (now Justice) Francis did "not think this deficiency, of itself, marks a departure from the strictures of the Constitution." 28 *N. J. Super.* 280, 288 (*App. Div.* 1953).

This decision was reversed by the Supreme Court. Chief Justice Vanderbilt, for the majority (4–2), felt that the Director's consideration of the examiner's report amounted to the unlawful reliance upon evidence *dehors* the record.

> "[T]he mind of the decider should not be swayed by materials which are not communicated to both parties and which they are not given an opportunity to controvert. In the instant case the hearer can be characterized as a 'witness' giving his evidence to the judge behind the back of the appellant, who has no way of knowing what has been reported to the judge.
>
> \*    \*    \*    \*    \*    \*    \*    \*
>
> Where, as here, the final decision is rendered by one who did not hear the evidence but relies, in part at least, upon the findings and report of the hearing officer, there is an obvious danger that the decision may be based on findings set forth in the hearer's report that are not supported by the evidence." 15 *N. J.*, at *pp.* 516, 523

In his dissenting opinion, Justice Jacobs made two important observations. In the first place, the procedure followed by the Director "did not materially differ from that followed by appellate judges whose law clerks prepare preliminary memoranda often embodying analyses of the testimony and their views." *Id.*, at *p.* 530. It was further pointed out that the majority had misunderstood the concept of reliance upon extrajudicial evidence. A hearer's report does not contain any new evidence but simply amounts to a synthesis and evaluation of evidence already in the record which has been subjected to the scrutiny of both parties.

The *Mazza* doctrine was extended in *Fifth St. Pier Corp. v. City of Hoboken*, 22 *N. J.* 326 (1956). There the administrative hearing had been held before a panel comprised of two members of the Division of Tax Appeals. The decision of the

entire Division was based solely upon a *report* of the findings of the hearing panel, since no transcript was required to be prepared. Although this report had not been furnished to the parties before the final decision, it was made public with the decision.

The Appellate Division again sustained the procedure followed by the agency. 40 *N. J. Super.* 12 (*App. Div.* 1956). Judge Clapp distinguished *Mazza* on several grounds. In the first place, the hearer's report in *Mazza* had been completely secret. In *Fifth St. Pier Corp.*, the report had been made public when the Division's determination was issued. Thus, any errors in the report could be cleared up by judicial review. Moreover, the hearer in *Mazza* had been a subordinate. In *Fifth St. Pier Corp.*, the hearers were actual members of the Division, the body empowered by law to render the final decision. Finally, the agency in *Mazza* performed the dual function of prosecutor and judge, whereas the Tax Division is an independent deciding authority.

These distinctions were found irrelevant by the Supreme Court which reversed the ruling of the Appellate Division. In the first place, the Supreme Court held that complete fairness must obtain in the agency itself. It is not enough to leave the correction of error to the courts. "Due process requires that the litigant be allowed to make an impressionable contact with the powers of decision." 22 *N. J.*, at *p.* 337.

Concerning the status of the hearers, it was pointed out that the panel, although a part of the deciding authority, still did not have the complete power of decision. It was therefore concluded that "The fact that the Division may base its decision solely upon the panel report more than outweighs any distinctive features in the operative background of *Mazza* from the present case. Its rationale is equally applicable here." 22 *N. J.*, at *p.* 337.

It should be noted that the New Jersey rule as expounded by *Mazza* has been subjected to a meticulous denunciation by Professor Davis. 2 *Davis, Administrative Law* § 11.09 (1958). See also, *DeRemer v. United States,* 340 *F. 2d* 712, 717 (8

*Cir.* 1965); *T. S. C. Motor Freight Lines, Inc. v. United States,* 186 *F. Supp.* 777, 787–790 (*S. D. Tex.* 1960), affirmed 366 *U. S.* 419, 81 *S. Ct.* 1356, 6 *L. Ed. 2d* 387 (1961). However, the author was not particularly concerned with the narrow factual holding of *Mazza.*

"Hardly anyone will disagree with the idea that serving the examiner's report on the parties is desirable, although perhops a good many informed observers of the administrative process will doubt that the requirement ought to be imposed as a matter of due process. If the Mazza case involved no more, the only debatable question about the case would be the relatively unimportant question of whether the good result was brought about by a questionable method." 2 *Davis, op. cit., pp.* 72–73

What worried him was the court's broad holding that no factual or legal analysis of a case may be made for the benefit of the deciding authority unless such report is supplied to the parties with leave to criticize the conclusions of such report before the final decision of the authority.

One of the "seven major infirmities" found in *Mazza* by Davis was the court's misunderstanding of the concept of extra-record facts, as had been pointed out by Justice Jacobs in his dissent. There is a critical distinction between the use by the agency of new and secret extrinsic evidence, *In re Plainfield-Union Water Co., supra, Pennsylvania R. R. v. New Jersey State Aviation Comm'n, supra,* and the use of a legal analysis of the facts which have already been presented. 2 *Davis, op. cit. pp.* 80–81.

It is not for us to decide whether or not the opinion expressed by Professor Davis is a competent one. It is not our function as an intermediate appellate court to give theoretical opinions on the soundness of Supreme Court decisions. We must accept these decisions and decide whether the present case fits within their rationale.

Hackensack would distinguish this case from the *Mazza* rule on several grounds. Its first ground relates to the fact that the "secret" report in this case was in fact made public

and is thus subject to judicial review. As indicated above, this argument was put to rest in *Fifth St. Pier Corp., supra*.

Hackensack further argues that the hearing officers in this case were not subordinates but were actually members of the deciding authority. Although a similar argument was rejected in *Fifth St. Pier Corp., supra,* there is one difference in the instant case. In *Fifth St. Pier Corp.* the deciding authority relied *solely* upon the hearers' report. No transcript of the hearing was sent to the members of the Division of Tax Appeals who had not heard the case. Here, of course, each member of the Council had the opportunity to study the transcript in addition to the hearers' report. Therefore, the possibility of undiscovered error in the report, which was of much concern to the court in *Fifth St. Pier Corp.,* was greatly diminished here.

In any event, there is another important difference in the instant case which we believe serves to distinguish this case from the *Mazza* rule. As indicated above, one of the conditions upon which the application was granted specified that "at any time, if and when indicated in the public interest, this approval may be reviewed for possible modification, revocation, or indemnification thereof." Thus, if any improprieties are found in the panel report which is now public, the objectors can petition the Council at any time for a redress of their grievance. This, we believe, preserves for the objectors their "impressionable contact with the powers of decision." What the objectors claim as a principle of due process is the right to examine the hearers' report and present objections thereto before the Council. By the very terms of the Council resolution, this right has been guaranteed to the objectors.

"An error of an administrative authority in basing a decision upon evidence outside the record or obtained without the presence of and notice to the parties, is not prejudicial where an aggrieved party has an opportunity to meet such evidence in administrative review proceedings." Annotation 18 *A. L. R.* 2d 552, 584 (1951). See also, *Victor v. Porter,* 157 *F.* 2d 769 (*Emer. Ct. App.* 1946), cert. denied 329 *U. S.* 801 [67 *S. Ct.* 491, 91 *L. Ed.* 685] (1947) ; *Simpkins v. State Banking Dep't,* [45 *Ariz.* 186] 42 *P.* 2d 47 (1935) ; *Dami v.*

*Department of Alcoholic Beverage Control*, [176 *Cal. App.* 2*d* 144], 1 *Cal. Rptr.* 213 (1959).

We note, in this regard, that the objectors have not presented to this court any meritorious reason which would dispose us to set aside the decision of the Council. It is, therefore, hard to imagine what argument they might present to the whole Council, now that they have full knowledge of the panel report, which would induce it to set aside its approval already given. The important consideration is that the objectors have been guaranteed the right to make such an application to the Council. Accordingly, the requirements of procedural due process have been met.

The determniation of the Council is affirmed, subject only to a modification of the condition relating to the minimum flow of 1,500,000 gallons daily in the Saddle River so as to make the same referrable to the flow immediately below the point of diversion, instead of above that point as originally stated.