BOARD OF EDUCATION OF THE TOWN OF WEST ORANGE IN THE COUNTY OF ESSEX, A CORPORATION, PLAIN-TIFF-APPELLANT, v. ELIZABETH WILTON AND AD-MINISTRATORS ASSOCIATION OF WEST ORANGE PUB-LIC SCHOOLS, DEFENDANTS-RESPONDENTS.

Argued November 9 and 10, 1970—Decided January 26, 1971.

*Mr. Samuel A. Christiano* argued the cause for appellant.

*Mr. Thomas P. Cook* argued the cause for New Jersey School Board Association, *amicus curiae.*

*Mr. John H. Dorsey* argued the cause for respondents Elizabeth Wilton and Administrators Association of West Orange Public Schools.

*Mr. Theodore A. Winard,* Deputy Attorney General, argued the cause for respondent Public Employment Relations Commission (*Mr. George F. Kugler, Jr.,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

FRANCIS, J. After the Legislature adopted the New Jersey Employer-Employee Relations Act, *L.* 1968, *c.* 303, *N. J. S. A.* 34:13A–1 *et seq.,* certain administrative employees of the West Orange Board of Education organized the Administrators Association of the West Orange Public Schools and requested the Board to recognize it as the collective negotiating unit for all supervisory personnel, except the Superintendent of Schools. *N. J. S. A.* 34:13A–5.3. On February 10, 1969, the Board recognized the Association as negotiating representative for principals, assistant principals, subject matter directors, and administrative assistants but excluded from the unit "Directors who act in supervisory capacity" over such personnel. Pursuant to this resolution, the Board refused to accept the Association as the appropriate negotiating unit for Elizabeth Wilton who holds the supervisory position of Director of Elementary Education.

The Association then filed a petition with the Public Employment Relations Commission asking that it be designated as the exclusive representative of all supervisory personnel of the Board, including Miss Wilton. *N. J. S. A.* 34:13A–6(d). Miss Wilton who had become a member of the Association joined in the petition. By way of answer, the Board of Education admitted that it had accepted the Association as the negotiating unit for the employees in the described categories. However, it asserted that the unit was not appropriate for Miss Wilton because her status as Director of Elementary

Education invested her with such supervision over the other employees included therein and such intimacy with the managerial aspects of the Board's operation that she should be excluded. The Commission referred the matter to a Hearing Officer for the taking of testimony and the making of a report and recommendation.

At the hearing, the Board's position was that Miss Wilton is a top echelon supervisor and as such does not belong in the same negotiating unit with principals, assistant principals, subject matter directors and administrative assistants because her duties require her to supervise them in the interest of the Board's management and control of the school system. On the other hand the Association, relying on *N. J. S. A.* 34:13A–3(d) and 34:13A–5.3, contended that all employees of the public school system, including those who have supervisory duties over teachers, excepting only the superintendent of schools, are eligible under the Act to join an employee organization. Section 13A–3(d) provides among other things that the term "employee" shall include any person holding "employment in the service of a public employer * * * provided that in any school district this shall exclude only the superintendent of schools or other chief administrator of the district." And under *Section* 13A–5.3 public employees are granted the right to join an employee organization, provided, however, that the right shall not extend to "any managerial executive" except that in a school district such executive "shall mean the superintendent of schools or his equivalent." It is provided also that "except where established practice, prior agreement, or special circumstances dictate the contrary," no "supervisor having the power to hire, discharge, discipline, or to effectively recommend the same" shall "have the right to be represented in collective negotiations by an employee organization that admits nonsupervisory personnel to membership, and the fact that any organization has such supervisory employees as members shall not deny the right of that organization to represent the appropriate unit in collective negotiations * * *." The

section further directs that the "negotiating unit shall be defined with due regard for the community of interest among the employees concerned * * *."

N. J. S. A. 34:13A–6(d) contains a further direction to the Commission with respect to the ascertainment of the appropriate unit. It says that "except where dictated by established practice, prior agreement, or special circumstances, no unit shall be appropriate which includes * * * both supervisors and nonsupervisors * * *." It may be noted in passing that no teachers actively engaged as such in the West Orange schools are members of this Association; its members are drawn exclusively from the administrative echelons. Moreover, there is no issue here concerning the propriety of including principals and assistant principals in the same negotiating unit. The possibility of conflict arising out of the principals' duty to supervise assistant principals, which might arise in certain settings (which we do not consider in this case), is not involved because the Board of Education has raised no issue with respect to this joint membership in the Association.

Substantial evidence was adduced before the Hearing Officer to show Miss Wilton's place in the administrative structure of the school system. Under Article V. Section 1 of the Board of Education Policy Manual, the Board appoints a Director of Elementary Education and a Director of Secondary Education "who shall be directly responsible to the Superintendent of Schools in the performance of all duties." To qualify for such appointment, the Directors must have experience at their respective levels in teaching, supervision and administration, and "a broad knowledge of educational problems." The Board's organization chart shows the Director of Elementary Education (Miss Wilton) on a higher plane in the administrative hierarchy than elementary school principals. In the chain of authority, it positions the Director on a direct line above the principals below whom it places the "teachers, nurse, pupils, secretaries and custodians." The Director of Secondary Education is shown on

the chart on the same plane as the Director of Elementary Education. In a direct line below the Director of Secondary Education (and on the same level as the elementary principals) are the secondary principals, below whom appear assistant principals, administrative assistant, department chairman, counselors, teachers, nurse, pupils, secretaries, custodians and cafeteria staff. The Board's Policy Manual, already referred to, reveals that among other things the Directors have the duties (1) of making recommendations and advising the Superintendent as to "needed extensions or readjustments of the educational program, services and activities of the school," (2) of assisting "teachers, principals, and other members of the professional staff in the improvement of instruction," (3) of encouraging the "continuous study of curriculum problems by principals" and promoting "all efforts for curriculum development and improvement in keeping with the best current practices and thought," and (4) of assisting "the Superintendent in the recruitment, selection, assignment, and transfer of teachers."

Each elementary or secondary school principal is in charge of a school building, and he in turn is "directly responsible to either the Director of Elementary Education or the Director of Secondary Education." Each principal has the further duty of making "all reports for his school as required by law or by the Directors of Education, and the Superintendent." In the area of secondary education where assistant principals are appointed, such persons are directly responsible to the building principal who is charged with the assignment of their duties.

In his testimony, the Superintendent of Schools outlined Miss Wilton's position as a supervisor in the administrative hierarchy of the West Orange schools. He said that as Director she is responsible for the administration of the elementary schools; she supervises the work of each of the nine elementary school principals and evaluates their performance for purposes of recommending tenure and salary increments for them to the Superintendent and the Board of Education.

In this connection the Board of Education pointed out that its by-laws provide that:

Favorable reports by the Superintendent of Schools and those charged with supervisory responsibility, and approval by the Board of Education are prerequisite to the granting of *all* increases in salary. There shall be no automatic increments or increases in salary.

The Superintendent also pointed out that, as Director, Miss Wilton holds regularly scheduled monthly meetings with the elementary school principals and she is responsible for the instructional program and curriculum development in the elementary schools. She reviews the budget proposals of all principals. She recruits teachers for elementary schools, interviews the candidates and recommends them to the Superintendent for appointment; she recruits or screens the staff personnel of the schools and recommends them to the principal. In turn, the principals will interview and observe candidates recommended by Miss Wilton, but if she recommends a person for a teaching post in a particular school and the principal does not wish such person, she would have the final say in the matter, subject, of course, to approval of her recommendation by the Superintendent or the Board of Education.

The Superintendent gave a number of examples of Miss Wilton's exercise of the duties and authority he described, including written evaluation reports of principals. Although she does not have the final power to either hire or discharge or to deny either tenure or a salary increment, no one in the case cited a single example of the refusal of the Superintendent or the Board to accept her recommendation. In this connection also, it may be noted that as an incident of her assigned tasks she is a regular attendant at the public meetings of the Board of Education. The principals of the various schools attend such meetings only on occasional request to discuss a particular subject.

In explaining why she had joined the Association and wished to have it represent her as well as the other super-

visory personnel who became members, Miss Wilton said each principal of an elementary school performs the same function, *i. e.*, the supervision of the teacher and other employees in his individual building, as she does for the entire elementary school system. In her opinion she has most in "common" with the supervisory personnel who are members of the Association. Her testimony as to her duties to the Board is worthy of specific mention:

Q. * * * Now, isn't it a fact that for all practical purposes that you are the so-called 'boss' of these people?

A. I prefer to be called the co-ordinator of these people. They are all well trained, educational leaders and I really try to co-ordinate their activities.

Q. Let me put it this way. The organizational charts, Exhibit number 5, * * * these people report to you. Isn't that correct?

A. Right, they do.

* * * * * * *

Q. So you are their immediate supervisor? * * *

A. Right.

Q. So basically when you testified that the principals performed the same function on a building level as you do in the essential office level, you didn't mean to imply there that these people were on the same level as yourself and [in?] the table organization?

A. No. They were performing the same duties on the building level as I perform on a system wide basis.

* * * * * * *

Q. Do you have any supervisory authority over the principals?

A. Yes, I do.

Q. And what is that supervisory authority?

A. I evaluate their performance with them; the same as a principal evaluates the performance of Vice-Principals, Administrative Assistants and teachers in his building.

Q. You make this evaluation for whom?

A. I make it for the Superintendent.

Q. And what is the basis of your evaluation? What factors are taken into consideration?

A. The way the Principal performs his staff. How well he does his job in the building. The way he works with his constituents; his parents.

Q. Now, as to Principals that are not on tenure, do you evaluate those?

A. Yes, I do. And every other Principal every three years the same as everyone else in the school system.

Q. Now, if a Principal was not performing up to the required standards, I assume your evaluation would be in the negative?

A. I would.

Q. And would it still be in the negative if that meant he would get tenure or he wouldn't get tenure?

A. Yes.

Q. What about income, Miss Wilton? Are you familiar with the section of the by-laws that states that increments are not automatic but are based upon the satisfactory evaluation?

A. Right.

Q. Do you make an evaluation of the [elementary] Principals in that regard?

A. Yes.

After reviewing the testimony and noting the fact that her salary for the year 1969-1970 was computed on a basis different from that of the teachers and principals, the Hearing Officer found that Miss Wilton was a "top level managerial employee rather than a rank and file supervisory employee," and that of the "top echelon managerial group" she was the only member of the Association. He agreed that the evidence weighed heavily in favor of the Board's view that to have Miss Wilton "in the same negotiating unit as the people she supervises constitutes a conflict of interest that could seriously reduce her effectiveness as an administrator." He concluded and so reported to the Commission, that it would be "inappropriate for her to be included in the same negotiating unit as administrators whom she supervises." Both the Administrators Association and Miss Wilton filed exceptions to the report and the matter was then taken under advisement by the Public Employment Relations Commission (PERC). PERC Rules, *N. J. A. C.* 19:14–16, 18.

After filing of the Hearing Officer's report and prior to decision by PERC, the exceptants sought to supplement the record by an affidavit of Miss Wilton to the effect that after the Hearer's report, the Superintendent of Schools hired an Assistant Superintendent of Curriculum and Instruction as of July 1, 1969, whom she described as "commonly referred to as Director of Education for grades K-12." She asserted that this hiring resulted in the elimination of her direct relationship with the Superintendent; that it made her "an assistant for elementary education to this new assistant su-

perintendent"; and that it had the effect (as shown by the "transitional organization chart of staff according to function") of placing her on the same administrative level as elementary and secondary principals. She claimed, therefore, that the proposed change provided further reason for including her in the negotiating unit proposed by the Administrators Association.

Thereafter, the Superintendent of Schools filed an additional affidavit asserting that the Board of Education had never adopted the transitional organization chart which was prepared and discussed on or about March 6, 1969, prior to the hearing before the Hearing Officer. He asserted that the alleged position of Director of Education referred to in Miss Wilton's affidavit did not exist, and further that her relationship to the elementary principals had not changed "one iota." Her supervisory duties as detailed above remained the same and, as Director of Elementary Education, "the nine elementary principals will continue to be directly responsible to Miss Wilton." His affidavit said, however, that she would report in the future to the "new Assistant Superintendent of Schools in Charge of Curriculum and Instruction, K-12."

No additional testimony was taken by PERC with respect to the factual assertions made in the affidavits; no additional findings were made as to whether there would be any downgrading of Miss Wilton's supervisory status as of July 1, 1969. This phase of the matter should be pursued further on the remand which we direct hereinafter.

On July 2, 1969 PERC reversed the holding of the Hearing Officer and ruled as a matter of law that Miss Wilton had such a "community of interest" with the other members of the Association as warrants her inclusion in the collective negotiating unit. In doing so, it said:

The Act provides that supervisors may not be represented by an organization that admits non-supervisory personnel and that supervisory personnel and non-supervisory employees may not be combined in the same unit in the absence of established practice, prior

agreement or unusual circumstances. The Act is clear and unambiguous in not proscribing the right of various ranks of supervisors to be combined in the same unit or belong to the same organization.

Therefore, PERC declared that the Director of Elementary Education may be included in the specified "unit of supervisors and administrators and may be represented by the Association." Thereafter, the Board of Education sought a review in the Appellate Division which affirmed in an unreported *per curiam* opinion, and we granted certification. 56 *N. J.* 97 (1970).

In reaching its decision, PERC construed Sections 13A–3(d) and 13A–6(d) to mean that in school districts only the superintendent of schools is excluded from an employees' unit and that all persons who qualify as supervisors may properly be assigned to an organization of supervisors, irrespective of their relation to each other, the nature of the authority of one or more over the others, or whether the public employer has placed one employee on a higher plane of authority and supervision in the organizational structure of the school system than other supervisors. We cannot agree with such a broad interpretation. If followed unqualifiedly in all situations, it might seriously weaken the effectiveness of the statute as an instrument of meaningful public employer-employee relations. In some situations, obviously, it might put the *employer,* in the form of a high echelon supervisor, on both sides of the negotiating table to the detriment of the *employees* in the unit; in other situations it might put an employee on both sides of that table and deprive the employer of the loyalty he has the right to expect from an employee entrusted with administration of management supervisory policy.

In seeking out the proper solution for the present case, two factors, apparently considered to have been significant by PERC, should be evaluated. First, it pointed out that despite a degree of supervision by principals over assistant principals both classes are included in the Association

negotiating unit. That fact has no particular bearing here because, as noted above, both grades of supervisors are members of the Association and the Board of Education has raised no issue with respect to their membership. Secondly, PERC referred to Miss Wilton's desire and consent to be a part of the unit. Her consent is an element which may be considered but, as in the private employment sector, it should not be deemed controlling. See *NLRB v. Delaware-New Jersey Ferry Co.*, 128 *F.* 2d 130, 137 (3 Cir. 1941). The determinative factor, so far as Miss Wilton is concerned, in ascertaining the appropriateness of a unit is neither what she wants nor what the public employer wants, but rather whether her inclusion in the unit will serve and not subvert the purpose of the Act., *i. e.*, establishment and promotion of fair and harmonious employer-employee relations in the public service.

There is no doubt that the Legislature intended to authorize appropriate independent negotiating units for supervisory employees (except the superintendent of schools or his counterpart) of the Board of Education. But there is no clear and unqualified direction in Sections 13A–5.3 and 13A–6(d) to permit all such supervisory employees to join a single negotiating unit and to require the Board to recognize it as their exclusive negotiating representative, regardless of gradations of duties of particular supervisors. Ordinary considerations of employer-employee relations make it sensible to say that if performance of assigned duties by a particular supervisor bespeaks such an intimate relationship with the management and policy-making function as to indicate actual or potential substantial conflict of interest between him and other supervisory personnel in a different or lower echelon of authority, such supervisor should not be admitted to the same negotiating unit. Admission would not be fair either to the other supervisory employees or to the employer. Obviously no man can serve two masters.

Organizational problems of public employees with respect to the proper place of supervisors were studied by the Advisory Commission on Intergovernmental Relations (ACIR),

a commission established by Congress, and referred to in its comprehensive report of September 1969, entitled Labor Management Policies for State and Local Government. Although the ACIR Report concerns itself largely with the question whether supervisors should be allowed to join a rank-and-file employees' organization, it does recognize and comment on additional difficulties connected with various grades of supervisory officials. It said, among other things:

> From the viewpoint of a union or association, certain objections also can be raised concerning participation by supervisors and other middle-managers in their activities. Supervisory personnel cannot remove themselves entirely from an identification with certain management responsibilities, and this can generate intraunion strife. Their involvement in union or associational affairs in effect places management on both sides of the discussion table. State legislation dealing with public labor-management relations, then, should clearly define the types of supervisory and managerial personnel which should not be accorded employee rights. ACIR Report, *supra*, at 95–96.

Whether the matter under discussion is concerned with the propriety of supervisors joining the same organization as ordinary employees, or the propriety of supervisors in various degrees of managerial proximity in relation to the employer and each other belonging to the same organization, the issue would seem to be substantially the same. Are the duties, authority and actions of the employee in question, vis-a-vis the other employees in the Association, primarily related to the management function? To what extent does the reasonable and good faith performance of the obligations a supervisor owes to his employer have capacity, actual or potential, to create a conflict of interest with other supervisors whose work he is obliged to oversee and evaluate for his employer?

Unfortunately it cannot be said that the language used in Sections 13A–5.3 and 13A–6(d) regarding the appropriate negotiating unit for supervisors in a school system clearly expresses the solution intended by the Legislature. The superintendent of schools or his equivalent is excluded beyond question. Further, except where "established practice, prior

agreement or special circumstances, dictate the contrary" no "supervisor having the power to hire, discharge, discipline, or to effectively recommend the same" shall "have the right to be represented in collective negotiations by an employee organization that admits nonsupervisory personnel to membership * * *." See appendix.

In May 1970, the Advisory Commission on Intergovernmental Relations drafted a comprehensive model statute. See Government Employee Relations Report, 51.215 (1970). It defines "public employee" as

> any person employed by any public agency excepting those persons classed as legislative, judicial, or supervisory public employees; elected and top management appointive officials; and certain categories of confidential employees including those who have responsibility for administering the public labor-management relations law as a part of their official duties. Section 2(1).

"Supervisory employee" means

> any individual having authority, in the interest of the employer, (i) to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or (ii) responsibility to direct them, or (iii) to adjust their grievances, or (iv) effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment. Section 2(2).

"Confidential employee" means

> one whose functional responsibilities or knowledge in connection with the issues involved in the collective negotiations process would make his membership in the same organization as rank-and-file employees incompatible with his official duties. Section 2(3).

The American Federation of State, County and Municipal Employees drafted a National Public Employee Relations Bill which was introduced in Congress as H. R. 17383 on April 30, 1970. In dealing with the issue of appropriate unit, it provides in Section 6(c):

In order to assure to employees the fullest freedom in exercising the rights guaranteed by this Act, the Commission shall decide in each case the unit appropriate for the purposes of collective bargaining, and shall consider such factors as community of interest, wages, hours and other working conditions of the employees involved, the history of collective bargaining, and the desires of the employees; *Provided,* That, except in the case of units of firefighters, supervisors shall not be placed in a bargaining unit which includes nonsupervisory employees; *Provided, further,* That a unit may be found to be the appropriate unit in a particular case, even though some other unit might also be appropriate, or might be more appropriate. Government Employee Relations Report, *supra,* at 51.201, 203.

It seems plain that basically the quoted language is intended to preserve the line of demarcation between rank-and-file employees and supervisors having the described type of employer-delegated authority and thus to avoid the obvious potential conflict of interest between them.

The fact that potential conflict of interest in a given case may bar supervisors from representation by an organization of nonsupervisory employees does not mean that the former have no organizational rights. Under our statute, supervisors are employees and ordinarily have the right to join and be represented by an organization of their own, *i. e.,* an organization of supervisory personnel. But here again, if there are grades or echelons of supervisors having differing relations to each other because of the quantum of managerial or supervisory authority or duty delegated by the employer, the general exclusory language of *N. J. S. A.* 34:13A–5.3, quoted above, would seem to throw some light on the legislative intention with respect to the organizational rights of such supervisors. Should not the language of that section by reasonable implication be deemed to bar a supervisor from the same unit as other supervisors if he has such a degree of supervision over the others as to reveal a potential, substantial conflict of interest between them? In addition to the exclusory language, Section 13A–5.3 contains a further qualification for unit membership. It prescribes that "[t]he negotiating unit shall be defined with due regard for the community of interest among the employees concerned * * *."

No express definition of the phrase "community of interest" is contained anywhere in the statute. Nor was it defined in the Final Report of the Public and School Employees' Grievance Procedure Study Commission on which *L.* 1968, *c.* 303 *(N. J. S. A.* 34:13A–1 et seq.) was based. That Report limited itself to the single statement that in determining the appropriate unit "community of interest" among the employees and the structure of the appointing authority should be considered. Report at 23.

The 1969 Report of the Advisory Commission on Intergovernmental Relations, *supra,* mentions "community of interest" as a major criterion used in determining the appropriate unit for purposes of collective negotiation. But it refers to the test as a "somewhat elusive concept." ACIR Report, *supra,* at *p.* 74. It says also that since supervisors by definition include those having authority to effectively recommend hiring, transfer, suspension, promotion, discharge or discipline and to assign and direct work as well as to adjust grievances, their inclusion in a unit with nonsupervisory personnel has been opposed on grounds that it makes for conflict rather than community of interest. *Id.*

We have found no court decision in the public employment relations field which undertook to set out an explicit or mathematically precise definition of community of interest. We recognize that traditional connotations of "management" and "employee" in private sector labor relations may not be identical in the public arena because of the more complex personnel systems and wage and promotion controls of state and local governments. Nevertheless, decisions in the private sector, which speak in terms of the nature of the interests involved with regard to the issue of inclusion of supervisory and nonsupervisory employees in the same bargaining unit, throw light on the present problem.

In the private sector, the cases regard unity of interest, common control, dependent operation, sameness in character of work and unity of labor relations as pointing to common interest. They regard similarity of obligation to the em-

ployer as a factor; likewise similarity of working conditions; they consider the possible disruptive effect on employer-employee relations if the employees involved are admitted to one unit. They decide whether the group involved will operate cohesively as a unit; whether the unit will probably be effective in the public quest for industrial peace. Community of interest has been regarded as identity of interest. An important consideration is whether an employee sought to be included in a unit is one from whom the other employees may need protection; whether his inclusion will involve a potential conflict of interest. See *Westinghouse Electric Corp. v. NLRB,* 398 *F.* 2d 669 (6 Cir. 1968); *Retail Clerks International Ass'n, A.F.L.-C.I.O. v. NLRB,* 125 *U. S.* App. *D. C.* 63, 366 *F.* 2d 642, 644–645 (1966), *cert. den.* 386 *U. S.* 1017, 87 *S. Ct.* 1373, 18 *L. Ed.* 2d 455 (1967); *NRLB v. Glen Raven Knitting Mills,* 235 *F.* 2d 413, 415 (4 Cir. 1956); *NLRB v. Packard Motor Car Co.,* 157 *F.* 2d 80, 84–85 (6 Cir. 1946), *aff'd* 330 *U. S.* 485, 67 *S. Ct.* 789, 91 *L. Ed.* 1040 (1947).

These decisions in the private sector take on significance in our case when it is realized that the definition of "supervisor" in the National Labor-Management Relations Act provided the pattern for many of the definitions appearing in the public employment relations statutes set forth in the appendix.

The Federal statute is as follows:

The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment. 29 *U. S. C. A.* § 152 (11).

On the Federal scene it may be noted also that in the public service supervisors may not be in the same unit as the

employees supervised. More particularly Section 10(b)(1) of Executive Order 11491 provides among other things that:

(b) A unit may be established on a plant or installation, craft, functional, or other basis which will ensure a clear and identifiable community of interest among the employees concerned and will promote effective dealings and efficiency of agency operations. A unit shall not be established solely on the basis of the extent to which employees in the proposed unit have organized, nor shall a unit be established if it includes —

(1) any management official or supervisor, * * *. Government Employee Relations Report, *supra*, at 21:106; see also Executive Order 10988, § 6(a), Government Employee Relations Report, *supra*, at 21:1052.

The New York Public Employees' Fair Employment Act is even less specific than that of New Jersey in regulating and defining the appropriate negotiating unit. It does not undertake in specific terms to control the inclusion of supervisors and non-supervisors in a single unit. It provides:

(a) the definition of the unit shall correspond to a community of interest among the employees to be included in the unit;
* * * * * * * *
(c) the unit shall be compatible with the joint responsibilities of the public employer and public employees to serve the public. *Civil Service Law* Mc Kinney's Consol. Laws, c. 7, § 207 (1).

However, it is obvious from the New York statute, as it is from that of our State, that both Legislatures intended PERC and PERB (the New York counterpart of PERC) to determine the appropriate negotiating unit in the event of a dispute. Even though the authority delegated is somewhat less explicit than that of the New Jersey enactment, PERB has passed upon the question whether supervisors and the employees supervised have sufficient community of interest to justify membership in the same unit.

*In the Matter of New York State Division of State Police et al,* Case No. 0062, C–0130, C–0133, *N. Y. PERB Decisions* § 1–399.92 (July 1, 1968), the Board said:

The Public Employees Fair Employment Act does not define supervisors or exclude supervisors from coverage thereunder as does the National Labor Relations Act in the private sector, or as does Executive Order 10988 in federal civil service, or as do some other state acts regulating public employment relations, such as Wisconsin. This omission is not a legislative oversight, but rather reflects the recommendations of the Taylor Committee. * * *

Thus, the legislature apparently concluded that the inclusion or exclusion of supervisory employees should be determined by the application and implementation of the criterion of community of interest.

The Board agrees with the Director of Representation that the application of the community of interest criterion *mandates a consideration of the question of conflict of interest among the employees in the proposed unit.*

The mere existence of supervisory responsibilities does not require a conclusion that there is present such a conflict of interest as to overcome or outweigh other facts or circumstances giving rise to a community of interest. Rather, it is the degree and the nature of the supervision. Supervisory functions such as the imposition of discipline, effective initiation of disciplinary procedures or the evaluation of a subordinate's performance may indicate a conflict of interest. (Emphasis added.)

In deciding whether certain of the employees who wish to join a unit of other employees over the objection of the public employer should be permitted to do so, the New York Board looks for conflict of interest between the groups with respect to the obligations they owe to the employer and to each other. Obviously it considers substantial potentiality for conflict of interest as incompatible with the community of interest required for single unit membership. Significant indications of such conflict are existence of a duty in some of the group to evaluate the performance of others in the unit in the interest of the employer, and exercise by some of an influential part in matters of discipline or grievance procedures with respect to the others. If sufficient conflict of interest appears, the fact that all of the employees desire to be included in the same negotiating unit is not deemed controlling or determinative. See *In the Matter of Johnson City Central School District Board of Education et al,* Case No. C-0135, *N. Y. PERB Decisions,* § 1–399.55 (Sept. 17, 1968) ; *Opinions of Counsel to N. Y. PERB,* § 1–551 (June 28,

1968); and *cf. In the Matter of George McNamee et al,* Case No. R-042, *N. Y. PERB Misc. Opinions,* § 3–8006 (Feb. 25, 1970).

The nature of the appropriate negotiating unit is a most significant factor in the production and maintenance of harmony and peace in public employment relations. The extent to which supervisors should be permitted in units of rank-and-file employees, or of other supervisors, is essentially a matter of legislative policy. To the extent reasonably possible the question whether supervisory personnel should be included or excluded ought to be dealt with forthrightly and not vaguely or by silence. See ACIR Report, *supra,* at 95–96. Although Sections 5.3 and 6(d) of *N. J. S. A.* 34:13A are somewhat more explicit than the New York counterpart, and somewhat less explicit than statutes of other states, our statute in its totality is ambiguous as to whether all grades of supervisors in a local school system, except the superintendent of schools, or his equivalent, may be included in the same unit. But it is not wholly without direction. Except where established practice, prior agreement or special circumstances dictate the contrary, inclusion of nonsupervisory personnel in the same unit as supervisors who have "the power to hire, discharge, discipline, or to effectively recommend the same" is prohibited. Aside from these specifications, the nature of the negotiating unit is to be determined generally "with due regard for the community of interest among the employees concerned * * *."

In construing and applying Sections 5.3 and 6(d) PERC, as noted above, declared that only the superintendent of schools as a managerial executive was excluded from membership in an employees organization. It held also that those employees of a school system who are supervisors are barred only from a unit which admits non-supervisory personnel. But it ruled as a matter of law that the statute clearly authorized supervisors, whatever their rank or grade or the nature of their employer-delegated authority over or with relation to each other, to form a single unit which the em-

ployer has to accept as appropriate for purposes of negotiating conditions of employment. Such supervisors were regarded as conclusively possessing the required community of interest to satisfy the statutory prescription for an appropriate unit.

In dealing with Miss Wilton specifically, PERC considered her simply as another supervisor and, as such, entitled by unquestionable statutory prescription to a determination that the Association is an appropriate unit for her. The nature of her authority over the other supervisors or of her obligations to the employer vis-a-vis the others in the unit, or the fact that her compensation was fixed on a basis different from the others was not felt to be significant. We cannot agree.

■ One underlying concept which emerges from a study of statutes, texts and judicial decisions in employer-employee relations, whether in the public or private employment sector, is that representatives of the employer and the employees cannot sit on both sides of the negotiating table. Good faith negotiating requires that there be two parties confronting each other on opposite sides of the table. Obviously both employer and employee organizations need the undivided loyalty of their representatives and their members, if fair and equitable settlement of problems is to be accomplished. Unless the participation is of that calibre, the effectiveness of both protagonists at the discussion table would be sharply limited. All of this signifies that there should be a clear and identifiable community of interest among the employees who constitute the appropriate unit to negotiate their problems with the employer. If performance of the obligations or powers delegated by the employer to a supervisory employee whose membership in the unit is sought creates an actual or potential substantial conflict between the interests of a particular supervisor and the other included employees, the community of interest required for inclusion of such supervisor is not present. While a conflict of interest which is *de minimis* or peripheral may in certain circumstances be toler-

able, any conflict of greater substance must be deemed opposed to the public interest. *Cf. NLRB v. Security Guard Service, Inc.,* 384 *F.* 2d 143 (5 Cir. 1967).

In the present case, PERC made no evaluation, in terms of conflict of interest, of the facts relating to Miss Wilton's position as Director of Elementary Education and the nature of the supervision she was obliged to exercise over other supervisors, such as elementary school principals in the lower echelon of authority. There is no doubt that it was her duty, among other things, to supervise the work of the principals of the nine elementary schools and to evaluate their performance for the purpose of reporting and making recommendations to the Superintendent of Schools with respect to salary increases and tenure for them. In the performance of such tasks she owed undivided loyalty to the Board of Education. If she were joined in an employees unit which included the principals whose work she was duty bound to appraise in the Board's interest, would she be under pressure, real or psychological, to be less faithful to the Board and more responsive to the wishes of her associates in the negotiating unit? She is obliged, of course, to be fair and nondiscriminatory in evaluating the principals, and if the Association felt that she was consciously or unconsciously in error in doing so, presentation of a grievance would undoubtedly result. In that event she would have to defend against a complaint made by an organization of which she was a member.[1]

---

[1] It is worthy of note on this phase of the problem that at the June 12, 1969 Hearing before the Advisory Commission on Intergovernmental Relations on Labor-Management Policies for State and Local Government at Washington, D. C., the Chairman of the Wisconsin Employment Commission made this comment:

"I cannot imagine any grievance procedure being very meaningful if the supervisor who is involved in the resolution of grievances is an active member or holding office in the union which is processing a grievance on behalf of rank and file employees. In private labor relations supervisory personnel are excluded from coverage and/or membership generally in employee organizations primarily because of the opportunity of the employer, through said supervisors, to dominate the affairs of the union and thus destroy its effectiveness as a true representative of the employees." ACIR Report, *supra,* at 148.

In this connection it must be noted that the by-laws of the Association provide for a grievance committee. Section 2 thereof says that the committee shall be a representative body "to include but not be limited to: 1 Director; 1 Secondary Principal; 1 Junior High; 2 Elementary; 1 Assistant Principal." Thus, while the record is silent on the point, it appears that Miss Wilton may well be a member of the committee designed to process grievances against her own actions.

As we pointed out in *Lullo v. International Ass'n of Fire Fighters*, 55 *N. J.* 409 (1970) and in *Burlington County Evergreen Park Mental Hospital v. Cooper*, 56 *N. J.* 579 (1970) the New Jersey Employer-Employee Relations Act represents this State's first comprehensive legislative incursion into the field of public sector labor relations. Consequently, administration of the statute by PERC and, when necessary, review of its action as well as interpretation of the legislative language by courts, must be engaged in with great care in order that the intent and spirit of the statute may be fully realized and developed in the public interest. On the basis of our discussion in this case, we are satisfied, despite the ambiguity in the statute, that PERC was in error in declaring that all the supervisors, regardless of their status with respect to each other, *per se* possess the community of interest which requires or justifies their inclusion in the same negotiating unit. As indicated above, we hold that where a substantial actual or potential conflict of interest exists among supervisors with respect to their duties and obligations to the employer in relation to each other, the requisite community of interest among them is lacking, and that a unit which undertakes to include all of them is not an appropriate negotiating unit within the intendment of the statute. In our judgment, in the absence of a more definitive legislative treatment of the problem of appropriate unit for supervisors, each case must be determined on its own particular facts. Patently, authority to make the determination on the facts is

committed to PERC and unless its finding is arbitrary or unreasonable, the courts will not interfere.

Here, however, PERC did not perform its fact-finding function. it assumed existence of the necessary community of interest between Miss Wilton and the other supervisors in the unit simply because she was classified as a supervisor. Adequate treatment of the problem required an evaluation of the specific nature of the authority delegated to her as Director of Elementary Education to supervise and review the work of other supervisors and to make responsible and effective recommendations to the Superintendent of Schools with respect to the hiring, salary and tenure of principals, as well as the operation of the elementary schools. If good faith performance of the obligation to the Board of Education arising from the authority delegated to her gives rise to a substantial potential for conflict of interest, the fact that she desires to join the same unit as those she must supervise cannot be deemed sufficient warrant for her membership therein. PERC must decide whether, on a fair appraisal, her role puts her on the management side of the negotiating table. If so, a temporary or short term advantage to the Association that might come from allowing her to be in the supervisors' unit would be more than outweighed by the long term disadvantage to effective and healthy labor relations.

Under the circumstances the determination of PERC and the affirmance thereof by the Appellate Division are reversed. The matter is remanded to PERC for a specific fact finding and statement of the reasons therefore, as to whether Miss Wilton's obligations to her employer as they now exist are sufficiently indicative of potential conflict of interest between her and the other supervisors to require her exclusion from the Administrators Association negotiating unit. When such determination is made, any aggrieved party may seek a review thereof in the Appellate Division. Upon filing of the notice of appeal, an application may be made to this Court for immediate certification.

## APPENDIX.

Public employer-employee relations statutes in other jurisdictions have more detailed definitions of supervisory employees. Some of them may be noted:

The Connecticut Act says:

"The board shall have the power to determine whether a supervisory or other position is covered by * * * [this act] in the event of a dispute between the municipal employer and an employee organization. In determining whether a supervisory position should be excluded from coverage under * * * [this act], the board shall consider, among other criteria, whether the principal functions of the position are characterized by not fewer than two of the following:

(A) Performing such management control duties as scheduling, assigning, overseeing and reviewing the work of subordinate employees;

(B) performing such duties as are distinct and dissimilar from those performed by the employees supervised;

(C) exercising judgment in adjusting grievances, applying other established personnel policies and procedures and in enforcing the provisions of a collective bargaining agreement; and

(D) establishing or participating in the establishment of performance standards for subordinate employees and taking corrective measures to implement those standards * * *." *Conn. Gen. Stat. Ann.* § 7–471 (2) (*Supp.* 1970–71) (1965 *P. A.* 159, § 5 (2) ).

The Hawaii Act 171, *L.* 1970 provides:

"Supervisory employee" means any individual having authority in the interest of the employer, to hire, transfer, suspend, layoff, recall, promote, discharge, assign, reward, or discipline other employees, or the responsibility to assign work to and direct them, or to adjust their grievances, or effectively to recommend such action, if, in connection with the foregoing, the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment. § 2 (18).

The Baltimore, Maryland, City Code §§ 110–124, Art. 1 specifies as does the New Jersey statute that no unit shall "be deemed appropriate if it includes both supervisory and non-supervisory personnel." Section 116. It defines supervisory employees in the same fashion as the Hawaii Act, *supra.* Section 111 (j).

The Pennsylvania Public Employee Relations Act, *L.* 1970, Act 195 (43 *P. S.* §§ 1101.101 to 1101.2301) defines "supervisor" as

"\* \* \* [A]ny individual having authority in the interests of the employer to hire, transfer, suspend, layoff, recall, promote, discharge, assign, reward or discipline other employes or responsibly to direct them or adjust their grievances; or to a substantial degree effectively recommend such action, if in connection with the foregoing, the exercise of such authority is not merely routine or clerical in nature but calls for the use of independent judgment." § 301(6).

Provisions are included respecting determination of the appropriate unit of employees for bargaining purposes. Section 604 says that in determining the appropriateness of the unit, the board shall,

(1) Take into consideration but shall not be limited to the following:
(i) public employes must have an identifiable community of interest, and (ii) the effects of over-fragmentization.
\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*
(5) Not permit employes at the first level of supervision to be included with any other units of public employes but shall permit them to form their own separate homogenous units. In determining supervisory status the board may take into consideration the extent to which supervisory and nonsupervisory functions are performed.

Rhode Island has a special statute applying only to teachers. However, superintendents of schools, assistant superintendents, principals and assistant principals are excluded from representation by an association or labor organization. *R. I. Gen. Laws* § 28–9.3–2 (*P. L.* 1966, *c.* 146, § 1).

In Vermont the State Employees Labor Relations Act, P. A. 1969, No. 113, provides that in determining the appropriate collective bargaining unit the state employee labor relations board shall consider certain factors. Among them are the "authority of governmental officials at the unit level to take positive action on matters subject to negotiation," and the "appropriateness of the proposed unit to represent all employees within the unit having regard for the similarity

or divergence of their interests, needs, and general conditions of employment * * *." 3 *Vt. Stat. Ann.* § 941 (f)(1), (2).

The Wisconsin State Employment Labor Relations Act excludes from an employee organization employees "who are performing in a supervisory capacity, and individuals having privy to confidential matters affecting the employer-employe relationship * * *." *L.* 1966, *c.* 612, § 111.81 (12). "Supervisor" means:

* * * [A]ny individual having authority, in the interest of the state employer, to hire, transfer, suspend, layoff, recall, promote, discharge, assign, reward or discipline other employes, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment. *Wis. Stat. Ann.* § 111.81 (15) (Supp. 1970–71).

On June 17, 1970 a public employee labor relations code became effective in the District of Columbia by its Commissioner's Executive Order No. 70–229, as implemented by Chapter 25A of the District Personnel Manual. With respect to the appropriate unit it provided among other things that,

The essential ingredient in every unit is community of interest; however, an appropriate unit must also be one that promotes effective labor relations and efficiency of agency operations. A unit should include individuals who share certain interests, such as skills, working conditions, common supervision, physical location, organizational structure, distinctiveness of functions performed, and the existence of integrated work processes. § 8(a).

*For reversal and remandment*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.