**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3625-18T2

IN THE MATTER OF
UNION COUNTY COLLEGE,

    Respondent-Appellant,

and

UNION COUNTY COLLEGE
CHAPTER OF THE AMERICAN
ASSOCIATION OF UNIVERSITY
PROFESSORS,

    Petitioner-Respondent.

_____

Argued telephonically March 23, 2020 –
Decided July 28, 2020

Before Judges Ostrer, Vernoia and Susswein.

On appeal from the New Jersey Public Employment Relations Commission, P.E.R.C. No. 2018-011.

Matthew Joseph Giacobbe argued the cause for appellant (Cleary Giacobbe Alfieri Jacobs LLC, attorneys; Matthew Joseph Giacobbe, of counsel and on the briefs; Victoria A. Leblein, on the briefs).

Carl J. Levine argued the cause for respondent Union County College Chapter of the American Association of University Professors (Levy Ratner PC, attorneys; Carl J. Levine and Dana Lossia, on the brief).

Frank C. Kanther, Deputy General Counsel, argued the cause for respondent Public Employment Relations Commission (Christine R. Lucarelli, General Counsel, attorney; Frank C. Kanther, Deputy General Counsel, on the statement in lieu of brief).

PER CURIAM

Appellant Union County College (College) appeals from a Public Employment Relations Commission (Commission) order denying review of a "clarification of unit" decision of the Director of Representation (Director). The Director determined that the College's newly created "academic specialist" position shall be included in the collective negotiations unit of instructional and professional library staff (the Unit) represented by the College's Chapter of the American Association of University Professors (Chapter). The Director found that academic specialists are not supervisors under N.J.S.A. 34:13A-5.3, and share a community of interest with existing Unit members. Renewing the arguments it presented to the Commission, the College argues the agency's decision was arbitrary and capricious, violated the terms of the parties' collective negotiations agreement (CNA), and contravened the College's constitutional

rights. Having considered these arguments in light of the applicable principles of law and the record, we affirm.

I.

Subject to exceptions, the New Jersey Employer-Employee Relations Act (EERA or Act), N.J.S.A. 34:13A-1 to -44, generally grants public employees the right to join "employee organizations" to represent them in "collective negotiations." N.J.S.A. 34:13A-5.3. Under one such exception, "any supervisor having the power to hire, discharge, discipline or to effectively recommend the same" shall not "have the right to be represented in collective negotiations by an employee organization that admits nonsupervisory personnel to membership." Ibid.;[1] see also N.J.S.A. 34:13A-6(d) (stating "no unit shall be appropriate which includes . . . both supervisors and nonsupervisors"). Whether the academic specialists are supervisors is one of the determinative issues in this case.

In 2016, while the College and the Chapter were still negotiating their CNA for the 2015-2018 period, the College created the academic specialist position, whose duties would include instruction and various administrative tasks. This development followed the College's abolition in 2015 of the

---

[1] An exception to the exception is made "where established practice, prior agreement or special circumstances dictate the contrary." Ibid. That provision is not implicated in this appeal.

departmental chairpersons' position and the reorganization of the academic departments into divisions.

The College maintained that academic specialists did not belong in the Unit. The Chapter took the opposite view. Unable to agree, the parties entered into a non-waiver agreement, under which the Chapter preserved its "right to assert, through an appropriate action before the [Commission], that this classification [of academic specialists] should properly be included in the Union's negotiations unit."

The 2015-2018 CNA modified the previous CNA by removing references to departments and department chairpersons. It retained a "Recognition" provision that acknowledged that the Chapter represented "all full-time instructional and professional library staff" but not, among others, "managerial executives, confidential employees, . . . [and] supervisors . . . ." The Recognition provision also authorized the Chapter to represent persons holding newly created instructional positions, by stating, "[s]ubject to governing law," the CNA applied "to any and all accretions of the unit and specifically to all full-time instructional and professional library staff who perform duties which are the same as or are similar to the duties performed by full-time instructional and professional library staff currently employed by the [College's] Board."

4

The Chapter filed its Clarification of Unit petition in 2018, seeking to include academic specialists in the Unit. See N.J.A.C. 19:11-1.5. The Chapter contended academic specialists belonged in the Unit because they were full-time members of the instructional staff and did not fall under any excluded categories of employees. In support of its petition, the Chapter provided certifications from six current and recently retired faculty members who had decades of experience at the College and worked with newly appointed academic specialists.

The College contended the academic specialist title should not be included in the Unit because: it is a supervisory position; its inclusion in the Unit would present conflicts of interest; academic specialists lack a community of interest with other Unit members; and the CNA excluded academic specialists by excluding supervisors and covering full-time faculty who teach fifteen hours. The College relied on a certification from its human resources director who had worked at the college since 2015.[2]

---

[2] We note that the human resources director provided information "to the best of [her] knowledge and belief." See Jacobs v. Walt Disney World, Co., 309 N.J. Super. 443, 454 (App. Div. 1998) (stating that "factual assertions based merely upon 'information and belief' are patently inadequate" under Rule 1:6-6); Lippmann v. Hydro-Space Tech, Inc., 77 N.J. Super. 497, 504 (App. Div. 1962) (verification "to the best of the knowledge and belief of [the] deponent" is defective). Although Rule 1:6-6 does not govern, the human resources director's certification reflects a lack of personal knowledge about the matters she addressed.

The Chapter's witnesses maintained that academic specialists did not act as supervisors. Although academic specialists worked a full year in a non-tenure track position, compared to full-time faculty who generally worked ten months a year, the academic specialists were generally paid less than full-time faculty. The Chapter's witnesses stated that many of the administrative tasks assigned to academic specialists had previously been performed by full-time faculty, including departmental chairpersons, who were included in the Unit. The witnesses noted that faculty typically served on search committees, recommended hires, and evaluated their peers. The witnesses also cited instances in which academic specialists shared offices with full-time faculty, although the human resources director stated academic specialists generally shared offices with each other.

The human resources director cited the job description that stated academic specialists would provide up to nine hours of classroom instruction a week; by contrast, full-time faculty generally provided fifteen hours of instruction. However, the Chapter provided a job announcement stating academic specialists provided up to twelve hours of weekly instruction. The Chapter's witnesses also noted that full-time faculty often provided less than

fifteen hours, because they spent time on administrative duties, which was especially true of departmental chairpersons before the position was abolished.

Although the academic specialists' stated job duties included "using data and analytics to interview, observe, and evaluate adjunct and full-time faculty," the College presented no particularized evidence that academic specialists had played any role in the hiring, firing, or discipline of faculty. That authority rests with the division deans and the College's board. One Chapter witness stated she was unaware of academic specialists playing any role in hiring or evaluating faculty.

The human resources director stated that academic specialists had "input" into the College's budget and could be asked to make suggestions when items are needed for a specific activity. On the other hand, the Chapter presented evidence that former department chairpersons were actively involved in preparing budgets for their departments.

In a comprehensive written opinion, the Director found academic specialists should be included in the Unit. He rejected the College's contention that academic specialists were supervisors and their inclusion in the Unit would generate a conflict of interest. He concluded that academic specialists lacked the authority to hire, discharge, or discipline employees, particularly any Unit

A-3625-18T2

members.  Although academic specialists can recommend such actions, their recommendations are subject to review by supervisors.  The Director also determined that academic specialists do not perform duties that create a substantial conflict of interest with other members of the Unit.  He noted that all personnel decisions are made by others in the College's administration; and that the College failed to provide specific examples of evaluations or observations made by academic specialists that demonstrated a conflict of interest.

The Director also rejected the College's contention that academic specialists lacked a community of interest with the Unit members.  He considered the factors comprising a community of interest, such as a common employer, shared goals, common supervision, location of employment, job duties, and similarity in wages, hours, and terms and conditions of employment. He also considered the history of the Unit, noting that before 2015, instructional staff performed many of the administrative duties currently assigned to academic specialists in exchange for reduction in course load or extra pay.  He further noted that the Recognition provision did not prohibit the inclusion of academic specialists, and he cited to the Workplace Democracy Enhancement Act (WDEA), N.J.S.A. 34:13A-5.11 to -5.15, as additional support for the decision.

The College requested the Commission review the Director's decision. See N.J.A.C. 19:11-8.1. The College contended the Director erred because academic specialists are supervisors; they would present conflicts of interest within the Unit; and they lacked a community of interest with other members of the Unit. The College also contended the Director mistakenly relied on the 2012-2015 CNA, instead of the 2015-2018 CNA; the Director's decision violated the contract clause of the New Jersey and United States Constitutions; and the WDEA is unconstitutional. The College also asserted that the Director did not fairly consider materials the College submitted shortly before the Director issued his decision.

The Commission rejected these arguments and denied review. See N.J.A.C. 19:11-8.2(a). The Commission found the Director appropriately referred to the 2012-2015 CNA, noting that the College had not submitted the 2015-2018 CNA for the Director's consideration, and the unchanged Recognition clause authorized adding newly created positions. The Commission stated the Director's decision conformed to the Commission's preference for broad-based negotiation units.

The Commission also found no error in the Director's findings that similarities in the instructional duties of full-time faculty and academic

specialists predominated over their differences, noting that not all full-time faculty taught fifteen hours; and academic specialists could teach as many as twelve hours. Furthermore, although the departmental chairperson position was abolished, the Director appropriately considered the similarity between the administrative tasks they used to perform and the tasks now assigned to academic specialists. The Commission also found no error in the Director's analysis of the various community of interest factors.

The Commission rejected the College's complaint that the Director did not consider its pre-decision submission. The Commission reviewed the material and found it contained nothing that would justify a different outcome. The Commission also declined to reach the issue of the WDEA's constitutionality, but noted the Director's reliance on the WDEA was not material to his decision.

In its appeal of the Commission's decision, the College reprises the arguments it made before the agency.

## II.

We begin by noting our limited standard of review. The Commission's interpretation of the EERA is entitled to "substantial deference," and we will "yield to [the Commission] unless its interpretations are plainly unreasonable, contrary to the language of the Act, or subversive of the Legislature's intent."

N.J. Tpk. Auth. v. AFSCME, Council 73, 150 N.J. 331, 352 (1997). As for administrative determinations, such as those pertaining to the scope of negotiation or disputes involving the representation of public employees, we will not disturb the Commission's decision "unless it is clearly demonstrated to be arbitrary or capricious." In re Hunterdon Cty. Bd. of Chosen Freeholders, 116 N.J. 322, 329 (1989) (citing State v. Prof'l Ass'n of N.J. Dep't of Educ., 64 N.J. 231, 258 (1974)). We apply the same standard to a clarification of unit determination. Prof'l Ass'n of N.J. Dep't of Educ., 64 N.J. at 259 (applying arbitrary and capricious standard to challenge of Commission decision on community of interest and negotiating unit); Bd. of Educ. of W. Orange v. Wilton, 57 N.J. 404, 427-28 (1971) (applying "arbitrary or unreasonable" standard to Commission's determination whether conflict of interest existed that destroyed requisite community of interest of negotiating unit).

Determining the appropriateness of a negotiation unit is largely a discretionary decision. As the Court has observed, "[T]he concepts of appropriateness of unit and community of interest are necessarily very elastic" and they rely on "subjective value judgments, frequently difficult to articulate with precision, concerning the relative weight of various relevant criteria." Prof'l Ass'n of N.J. Dep't of Educ., 64 N.J. at 252-53. Consequently, "a great

degree of discretion must be reposed in the agency . . . ." Ibid. When an agency is vested with discretion to make a decision, its exercise "will not be disturbed absent a showing that the agency determination so departs from the record as to become arbitrary, capricious or unreasonable." In re Applications of N. Jersey Dist. Water Supply Comm'n, 175 N.J. Super. 167, 194 (App. Div. 1980).

To establish that a decision is arbitrary or capricious, the appellant must show the decision offends the Constitution; it violates legislative policies; the agency's findings are unsupported by substantial evidence; or the agency clearly erred by making a decision that could not reasonably be reached. Brady v. Bd. of Review, 152 N.J. 197, 211 (1997). We shall not substitute our judgment for an administrative agency's, where the result of its determination "is fairly debatable and is based upon policy choices made by the Legislature and committed for [the agency's] administration and enforcement." Caminiti v. Bd. of Trs., Police & Firemen's Ret. Sys., 394 N.J. Super. 478, 482 (App. Div. 2007).

We also exercise limited review of the Commission's factual findings, as "the evaluation of evidence is the province of [the Commission] rather than of the courts, and when these determinations fall within [the Commission's] special sphere of expertise, we accord them due weight." Hunterdon Cty. Bd. of Chosen Freeholders, 116 N.J. at 329.

Applying that standard of review, we shall not disturb the Commission's decision. We reject the College's argument that the Commission was obliged to find that academic specialists were supervisors, and therefore excluded from a unit that included non-supervisory personnel. See N.J.S.A. 34:13A-5.3, - 6(d). The statute defines a supervisor as someone who has "the power to hire, discharge, discipline, or to effectively recommend the same." N.J.S.A. 34:13A-5.3. There is no dispute that academic specialists lack the power to directly hire, discharge or discipline anyone. The question, then, is whether academic specialists were empowered to "effectively recommend" such action.

The Director found that the College's contention that the academic specialists effectively recommended hiring, discharge or discipline was unsupported by the record. Citing Commission precedent, the Director concluded that proof of a job description that includes supervisory functions is not enough; proof of the actual exercise of the function is required. Nor does the performance of observations and evaluations suffice where they are not closely connected to personnel actions. The Director noted that full-time faculty, and departmental chairpersons in particular, exercised a similar evaluative role without disqualification from inclusion in the Unit. The

Commission did not act arbitrarily in concluding that the Director applied "the requisite legal analysis."

Nor did the Commission err in leaving undisturbed the Director's finding that there exists a community of interest among academic specialists and unit members. N.J.S.A. 34:13A-5.3 directs the Commission to define a negotiations unit "with due regard for the community of interest among the employees concerned." The agency is required to evaluate the "particular facts" of each case and the "specific nature of the authority delegated," not simply an employee's classification, to determine whether the employee's duties create a "substantial potential for conflict of interest" with others in the unit. Wilton, 57 N.J. at 427. "An important consideration is whether an employee sought to be included in a unit is one from whom the other employees may need protection; whether his inclusion will involve a potential conflict of interest." Id. at 421.

The Director and the Commission complied with that guidance by looking beyond the academic specialist job description in finding a community of interest among existing Unit members and academic specialists. The Commission also endorsed the Director's consideration of such factors as "common employer, shared goals, common supervision, shared employment location, similar/related job duties, similar wages, and similar hours and terms

A-3625-18T2

and conditions of employment." Those factors have been cited in numerous decisions of the Director. All these factors weighed in favor of finding a community of interest in this case.

The Commission appropriately exercised its expertise and relied on its own precedent in determining that "a community of interest exists among virtually all non-supervisory educational employees and that a community of interest can be found among professional educational personnel who instruct students regardless of whether they are considered regular teachers or are employed in special programs." The Commission's adherence to its own precedent tends to show the lack of arbitrariness and capriciousness. See Steven L. Lefelt et al, 37 N.J. Prac., Administrative Law and Practice § 7.28 (2d ed. 2020).

The Commission's decision was also consistent with the policy favoring broad-based negotiation units, which the Supreme Court has found is implicit in the EERA. See Prof'l Ass'n of N.J. Dep't of Educ., 64 N.J. at 250-52. We may assume that, despite any differences in the duties of full-time faculty and academic specialists, the Chapter, as the Unit's representative, will "perform its duty fairly in respect of all within the unit and exercise its good judgment as to

when or whether different characteristics within the group warrant different demands." Id. at 258.

We also reject the College's argument that by equating academic specialists' job duties with those of former departmental chairpersons, the Commission disregarded the parties' contractual obligations in their 2015-2018 CNA, which abolished the departmental chairperson position. The Commission did not revive departmental chairpersons in violation of the new CNA. Rather, it appropriately considered the history of the parties' relationship in reaching the reasonable conclusion that if the performance of administrative tasks in the past by departmental chairpersons did not disqualify them from the Unit, then performance of similar tasks by academic specialists should not disqualify them either. Notably, the 2015-2018 CNA included a provision that if the College reinstituted departmental chairpersons, the applicable provisions of the prior CNA would govern, absent a subsequent agreement to the contrary.

Also, the Commission's decision did not override the CNA provision that full-time members of the instruction staff "shall be required to teach a maximum of fifteen (15) credit or equivalent contact hours per semester."[3] After the

---

[3] The College also contends that, in overriding the CNA's terms, the Commission unconstitutionally "impair[ed] the obligation of contracts." N.J.

College unilaterally created the position of academic specialists, the parties negotiated the 2015-2018 CNA based on a specific side agreement to leave open the issue of the representation of academic specialists. The two agreements must be interpreted together. See Nester v. O'Donnell, 301 N.J. Super. 198, 210 (App. Div. 1997) (stating that "'all writings forming part of the same transaction are interpreted together'" (quoting Barco Urban Renewal Corp. v. Housing Auth. of Atlantic City, 674 F.2d 1001, 1009 (3d Cir. 1982))). In essence, the parties contemplated that academic specialists could, if the Commission so determined, be included in the Unit, notwithstanding the later-agreed provisions of the CNA regarding required instructional hours. The Commission's decision simply requires the parties to negotiate appropriate terms and conditions of academic specialists' employment. Were one to accept the College's violation-of-contract argument, the side agreement would have been a nullity.

---

Const. art. IV, § 7, ¶ 3; U.S. Const. art. I., § 10. The Chapter argues that the College lacks standing to assert that the State, through the Commission, violated its constitutional rights. We need not address the issue as the Commission did not override or impair contractual rights. See Randolph Town Ctr., L.P. v. Cty. of Morris, 186 N.J. 78, 80 (2006) (stating that "[c]ourts should not reach a constitutional question unless its resolution is imperative to the disposition of the litigation").

We need not address the College's contention that the WDEA is unconstitutional, as the Commission did not rely on the WDEA. See Randolph Town Ctr., L.P., 186 N.J. at 80.

Nor shall we disturb the Commission's decision on the ground that the Director did not fairly consider materials the College submitted shortly before the Director issued his decision. The Commission reviewed those submissions and found they contained "no new material information that would warrant a substantive discussion about the possibility that any of the College's other bargaining units would be more appropriate for academic specialists than the AAUP."

To the extent not addressed, the College's remaining arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3625-18T2