175 N.J. Super. 167 (1980)
417 A.2d 1095
IN THE MATTER OF THE APPLICATIONS OF THE NORTH JERSEY DISTRICT WATER SUPPLY COMMISSION AND THE HACKENSACK WATER COMPANY.
Superior Court of New Jersey, Appellate Division.
Argued December 11, 1979.
April 1, 1980.
Decided June 30, 1980.
*177 Before Judges MATTHEWS, ARD and POLOW.
Bernard F. Conway argued the cause for appellant City of Paterson (Conway, Belsole & Gardner, attorneys; Bernard F. Conway and John G. Holl, on the briefs).
*178 Newton M. Roemer argued the cause for appellant Passaic Valley Water Commission.
Alfred C. Clapp argued the cause for respondent North Jersey District Water Supply Commission (George J. Minish, attorney).
William F. Hyland argued the cause for respondent Hackensack Water Company (Riker, Danzig, Scherer & Hyland, attorneys).
Deborah Poritz, Deputy Attorney General, argued the cause for respondents Commissioner of Environmental Protection and the Water Policy and Supply Council (John J. Degnan, Attorney General, attorney).
Frank Scangarella, Township Attorney, attorney for respondent Township of Wayne.
Anthony T. Drollas argued the cause for respondent Town of Nutley.
Marvin Lehman, City Counsel, argued the cause for respondent City of Elizabeth.
The opinion of the court was delivered by MATTHEWS, P.J.A.D.
On August 1, 1973 the North Jersey District Water Supply Commission (North Jersey) filed an application with the Water Policy and Supply Council (Council) for approval of plans to increase its diversion rights from the Ramapo River at Pompton Lakes by 25 million gallons a day (mgd), to increase its withdrawal limits from the Wanaque Reservoir and to construct a seven billion gallon reservoir on the Wanaque River at Monksville.
The Hackensack Water Company (Hackensack) and the Passaic Valley Water Commission (Passaic Valley) filed objections to the North Jersey application (commonly known as the Monksville Project) on November 28, 1973. Hearings commenced on December 10, 1973 and continued intermittently until July 22, 1974 for a total of seven days.
*179 On June 19, 1974, after the fifth hearing session, Hackensack filed an application with the Council for permission to divert 3,100 million gallons a month from the Pompton and Passaic Rivers at or below the confluence of said rivers from stream flows in excess of 926 mgd. The Hackensack and North Jersey proposals were obviously in potential conflict and the Monksville hearings were adjourned on July 22, 1974 to allow the parties and staff from the Division of Water Resources to meet. The major parties to the proceedings, North Jersey, Hackensack and Passaic Valley, agreed to hold a conference on August 5, 1974 in an attempt to develop a mutually agreeable proposal.
As a result, amended applications were submitted by Hackensack and North Jersey on August 11, 1975 for a joint project known as the Two Bridges proposal. This project called for an increase in diversion rights in the Ramapo River as well as the diversion of a maximum of 3,875 million gallons a month from the confluence of the Pompton and Passaic Rivers. Hearings on these amended applications commenced on September 8, 1975. The City of Paterson (Paterson) and Passaic Valley appeared in opposition to the proposal. A formal resolution opposing the applications was entered into the record. After a total of 52 days of hearings, proceedings terminated on April 10, 1978.[1] Briefs summarizing the positions of the parties were submitted in May 1978. Subsequently, on August 25, 1978, the report of the members of the Council acting as hearing officers was completed. The hearing officers recommended approval of the joint application with modifications and, on September 25, 1978, the Council adopted their report with minor changes.
In the interim, on January 3, 1977, Paterson moved to: (a) dismiss the applications or compel the applicants to amend them to delineate the routes of pipelines; (b) dismiss the applications to compel their amendment to include a request for condemnation; (c) compel the Council to provide all parties with its current plans for the economic and comprehensive development of the Passaic River and service area of the applicants; (d) *180 require full disclosure on the record of the details of all private meetings between the applicants and state agencies prior to filing of the amended applications; (e) require the Council to decide immediately two legal issues raised by the Public Advocate  "Does the doctrine of prior public use foreclose granting the applicants' condemnation powers?" and "Is the joint application ... violative of New Jersey statutes and case law?" The Council denied parts (a) through (d) of the motion on January 24, 1977. It never specifically addressed part (e).
In a separate but related procedure before the Department of Environmental Protection (D.E.P.), North Jersey sought permission pursuant to N.J.S.A. 13:1B-15.131 to encroach upon an historic site. The Great Falls at Paterson was included in the State Register of Historic Places on April 17, 1970. The Historic Sites Council (H.S.C.) met on March 10, 1977 and recommended a minimum acceptable flow over the Great Falls and through the Society for Establishing Useful Manufactures raceway (S.U.M.). Thus, both the Council decision and the Historic Sites application came before the Commissioner in the fall of 1978.
On October 31, 1978 Paterson moved before the Commissioner of the D.E.P. asking that (1) the proceedings be stayed until the applicants filed a written acceptance of the Council's report of August 25, 1978; (2) a review by the Commissioner be stayed until the H.S.C. fully reviewed and held hearings on the applications; (3) the Commissioner disqualify himself from the H.S.C. proceedings pursuant to N.J.S.A. 13:1B-15.131 and name a hearing officer to act in his place; (4) the Commissioner undertake a de novo review of these applications should the H.S.C. grant its approval, and (5) an order issue permitting all parties to submit "exceptions, objections and arguments" on any aspect of the applications.
On December 11, 1978 the Chief of the Office of Regulatory Affairs, acting for the Commissioner, denied Paterson's motion except that the parties were permitted to submit exceptions to the amended Council report directly to the Commissioner. On February 23, 1979 Commissioner O'Hern issued an order approving the recommendation of the Council and permitting encroachment *181 on the historic site. The Council informed the applicants on March 12, 1979 of the terms and conditions of approval and required acceptance of such terms within 90 days. Both North Jersey and Hackensack complied.
On April 5, 1979 the City of Elizabeth, the Township of Wayne and the Town of Nutley filed a notice of appeal from that portion of the Commissioner's final decision excluding them from sharing in the diversion planned by the Two Bridges project. On April 16, 1979 Paterson and Passaic Valley filed a joint notice of appeal from the Commissioner's decision approving the project.
Two weeks after the filing of this appeal, on April 30, 1979, Paterson instituted an action in the Chancery Division, Passaic County, by a self-styled "complaint for declaratory judgment, injunctive and other relief," naming North Jersey and Hackensack as defendants. Defendants thereafter moved for an order transferring the action pending in the Chancery Division to this court. That motion was denied by the Chancery Division judge during early September 1979, substantially for the reason that he was too unfamiliar with the action to rule on the question of transfer. Defendants then asked for a leave to appeal the denial of transfer and we refused to review that denial, staying the Chancery Division action pending determination of this appeal. Paterson and Passaic Valley also moved before us to stay the determination by us of certain legal questions which had been raised in the first point of Passaic Valley's brief. We reserved decision on that motion until disposition of this appeal.
In its seven-count complaint filed in the Chancery Division Paterson claimed in the first count that the agreements between North Jersey and Hackensack were void since there was no statutory authority for their existence; the second count claimed that the joint project here under review violated N.J. Const. (1947), Art. VIII, § III, par. 3. The third count claimed that Paterson was the owner of the riparian (sic) rights to the waters of the Passaic River within the geographical confines of the city and that the approval of the diversion granted by the Council would violate those rights. The count then asked that *182 the court declare that Paterson has all of the rights and provisions of a riparian (sic) owner of the waters of the Passaic and that the diversions sought by defendants were unlawful. The fourth count made a bare allegation of a breach of fiduciary duties allegedly owed by North Jersey to Paterson by virtue of an agreement dated June 4, 1925, providing for the construction of the Wanaque Reservoir. The fifth count was claimed to be brought under the provisions of N.J.S.A. 2A:35A-1 et seq., the Environmental Rights Act, and it alleged that the Two Bridges project under review here would cause pollution, and thus violate the provisions of the act. The sixth count was also brought under the Environmental Rights Act and it claimed that the United States Army Corps of Engineers had jurisdiction over the subject matter because the project would affect navigable waters. And the seventh count, also brought under the Environmental Rights Act, apparently asks the Chancery Division to review the Historical Sites decision made by the Commissioner of the Department of Environmental Protection which is under review here.
Disregarding the fact that the Chancery Division action was a transparent effort at delay, Paterson now claims that this court does not have jurisdiction to review the legal questions raised in the Chancery Division complaint for sundry reasons. We note at the outset that there are actually only two legal issues presently ripe for determination with respect to the proposed project which is the subject matter of this appeal and the Chancery Division action. Neither issue requires the development of a factual record since each is a purely legal issue. The first issue, which challenges the authority of North Jersey and Hackensack to enter into a joint venture, requires a determination as to whether there is any constitutional, statutory or decisional inhibition to the proposed arrangement. It is the basic concept of the joint venture that is challenged. We are not asked to pass upon specific contractual provisions of the venture since they do not presently exist. At this juncture we can only presume that if the relationship is valid, the parties will proceed in accordance with law. The second issue, that the joint *183 project violates N.J. Const. (1947), Art. VIII, § III, par. 3, by donating land or appropriating money to Hackensack Water Company, also involves a review of the core arrangement. If that arrangement is constitutional, there exist sufficient legal guidelines to cover the contractual relationship which may be entered into by the parties. See, e.g., Roe v. Kervick, 42 N.J. 191 (1964); Whelan v. N.J. Power & Light Co., 45 N.J. 237 (1965); Bayonne v. Palmer, 90 N.J. Super. 245 (Ch.Div. 1966), aff'd 47 N.J. 520 (1966), and again we must assume that they will be followed if the core arrangement is constitutional.
The questions dealing with Paterson's rights under its conveyance from the S.U.M. is premature since there is no showing, nor can there be, that the proposal as preplanned will violate any rights that Paterson has under the deed. Even if we accept Paterson's argument as correct, its remedy would be an action for damages and not for the remedy of injunction which is asked for in the Chancery Division action.
Paterson has also claimed in the Chancery Division that by designating the Great Falls a National Historic Landmark the Federal Government reserved the water rights to the Passaic River insofar as the Falls are effected. The short answer to this is that the Commissioner passed upon this issue in the proceedings below and, thus, it is clearly subject to review before us on this appeal. If, as Paterson claims, the joint venture will affect its rights under the National Historic Landmark designation, Paterson will not be foreclosed from instituting an appropriate action for compensation or such other relief as may be appropriate.
The argument with respect to jurisdiction of the United States Army Corps of Engineers is grossly premature and not ripe for adjudication. At the time of oral argument we were advised that engineers were being selected by defendants to engage in a feasibility study which will help establish the specifics of construction for the project. It is only after this information is gathered that a submission may be made to the Army Corps so that it may determine whether it should assert jurisdiction.
*184 The bald claim that there is a violation of fiduciary relationship allegedly created under the Wanaque Reservoir contract of June 24, 1925 is also premature since there is no indication that Paterson has been injured, or will be for that matter, at this stage of the proceedings. We have before us the decision of the Council which ostensibly takes into account the fears and claims of Paterson. Our review may well dispose of the basis for this anxiety.
Finally, the issues with respect to the coverage of the federal statutes, 33 U.S.C.A. § 1342 and 42 U.S.C.A. § 4321 et seq., assuming those statutes are applicable to this situation  a question we need not here decide  are premature. It is apparent that until the preliminary engineering studies are completed, no consideration can be given as to whether application to appropriate federal authorities should be made.
N.J. Const. (1947), Art. VI, § V, par. 3 gives this court original jurisdiction which it may exercise when appropriate. See, also, R. 2:10-5. The legal questions which are ripe for determination in this action are inextricably involved with the record review which we must perform on this appeal from the Council. R. 2:2-3(a)(2). For us to decide that the Council acted correctly and leave to another day the resolution of the validity of the acts approved would make no sense whatsoever. The Two Bridges project is clearly of major public concern and, accordingly, we deem it our obligation in the public interest that we pass upon those legal issues involved here by exercising our original jurisdiction. Compare Blasi v. Ehret, 118 N.J. Super. 501, 502 (App.Div. 1972). In view of this determination, we deny the motion for partial stay of these proceedings made by Passaic Valley and proceed hereafter to the determination of the legal issues involved.
North Jersey is a public authority established pursuant to N.J.S.A. 58:5-2.
... for the purpose of developing, acquiring and operating a water supply or a new or additional water supply for the use of the municipality and such other municipalities as may be authorized to join with it according to [N.J.S.A. 58:5-1 et seq.]
*185 North Jersey develops and operates water resources for specific municipal owners based on projections of need over reasonable periods of time. Hackensack serves 60 municipalities in Bergen and Hudson Counties. It is a public utility required under N.J.S.A. 48:2-23 to "furnish safe, adequate and proper service... and to maintain its property and equipment in such condition as to enable it to do so." North Jersey and Hackensack share a mutual obligation to the citizens of northeast New Jersey to insure the availability of an adequate supply of water.
In its initial Monksville application North Jersey proposed to increase its diversion from the Ramapo River at Pompton Lakes in order to develop an additional water supply of 25 mgd. This proposal was deemed necessary due to the overdrafting of the Wanaque system and the anticipated growth in demand which would place additional strains on the system's safe dependable yield.
Several municipalities petitioned North Jersey for acceptance into the Monksville project pursuant to N.J.S.A. 58:5-9 as follows:

 Bayonne 12.50 mgd
 Bloomfield 2.75 mgd
 Cedar Grove 2.50 mgd
 Elizabeth 10.00 mgd
 Kearny 5.00 mgd
 Nutley 3.00 mgd
 Wayne 10.00 mgd

North Jersey rejected Elizabeth's petition, taking the city's geographical location into account and the fact that Elizabeth could obtain water from the State's Raritan Valley project. The subscriptions called for 45.75 mgd and only 25 mgd was anticipated as a result of the Monksville project. North Jersey left it to the Council to determine which municipalities could demonstrate need and gain approval for admission into the project. See N.J.S.A. 58:1-20. As mentioned, a total of seven hearings were held before the Council concerning the Monksville project, beginning on December 10, 1973. Each municipality presented evidence concerning its need for a share of the Monksville water. When the revised Two Bridges proceedings began later, *186 the Council determined that testimony previously entered during the Monksville hearings would be considered a part of the record in the new proceedings.
Hackensack and Passaic Valley entered formal objections to the Monksville application at the initial hearing. The primary concern was that the upper Ramapo River, which had always been considered a prime source for long term expansion of water supplies following the full development of the Hackensack River and other local sources, would be depleted. Hackensack, which serves over 850,000 people in Hudson and Bergen Counties, urged that any proposed project more fully develop the 160 square mile drainage basis above North Jersey's diversion site in the Ramapo River to meet the needs of all northeastern New Jersey water consumers.
Passaic Valley objected to the construction of a dam and reservoir on the Wanaque River and to the inclusion of new non-Wanaque-Ramapo partner municipalities in the benefits of the project.
On June 19, 1974 Hackensack filed an application with the Council seeking to divert 3,100 million gallons during any month at or below the confluence of the Pompton and Passaic Rivers from stream flows in excess of 92.6 mgd, sufficient to develop an additional yield of approximately 46 mgd. This application was placed into evidence during the Monksville hearings on June 24, 1974. Since the Monksville application involved a diversion from the Ramapo River, a tributary of the Pompton River which is itself a tributary of the Passaic River, it would have ultimately diminished the water supply available for Hackensack's proposed diversion at Two Bridges. In view of the potential conflict in the two applications, North Jersey and Hackensack agreed with Passaic Valley to meet on August 5, 1974 to attempt to resolve conflicting issues and develop a modified mutually feasible project.
Further meetings followed, resulting in a proposed joint project between North Jersey and Hackensack which would effectively alleviate the anticipated problems of each applicant on a reasonably long-term basis. On August 11, 1975 North *187 Jersey and Hackensack each filed separate applications which the Council considered as amendatory to their original applications.
The Council commenced hearings on the two amended applications on September 8, 1975. Paterson entered objections to the pending applications on the record. Paterson feared that any diversion would adversely affect the aesthetic and cultural value of the Great Falls and the surrounding historic district, and would have an adverse impact on the quality of its water and the generating capacity of the hydroelectric facility it planned to construct. Passaic Valley's attorney announced it was "... not opposing and ... not in concurrence" at that time. On January 26, 1976, however, Passaic Valley entered a resolution in opposition to the project. It had initially been proposed that Passaic Valley would join in the project by moving its water intake facility from Little Falls to Two Bridges, and the staffs of the three entities had initially reached a verbal agreement which would have resulted in such a move.
During the course of the hearings voluminous evidence was presented dealing with matters ranging from the aesthetics of the Great Falls to the concerns of Passaic Valley relating to the quality of water flowing downstream of the Two Bridges project. Early in the proceedings the Council announced its intention to produce an environmental impact statement of its own which was originally scheduled to be presented on January 9, 1976.
Between January 12, 1976 and January 26, 1976 the Council, after meeting with the Division of Water Resources, decided that the Division would not only prepare the impact statement but would also evaluate the various concerns raised by Paterson and Passaic Valley. In connection with this evaluation, the Council read into the record detailed questions prepared by the Division which it requested the applicants, Paterson and Passaic Valley, to answer by February 23, 1976. The parties all submitted answers to the Division's questions.
*188 The Division decided that the best approach to the presentation of a comprehensive report would be to await the presentation of substantially all the evidence by the various parties before preparing a proposal which "would also substantially satisfy the valid concerns of all parties."
In April 1977 the Division's "Two Bridges-Ramapo Water Diversion Project Environmental Evaluation" was presented to the Council. The Division made two sets of recommendations, one based on the assumption that Passaic Valley would relocate its intake at Two Bridges and the other based on the assumption that it would not.
The Division concluded that the applicants had demonstrated a need for the water to be made available to the project but that the intake structure be changed to permit intake from two points, one where the Passaic River predominates and one where the Pompton River predominates. The numerous alternative projects proposed by Paterson were examined but none was found to be a viable alternative to the proposal made by the joint application of North Jersey and Hackensack.
The proceedings before the Council terminated on April 10, 1978. After receipt of briefs submitted by all the parties in May 1978, a six-member panel of the Council which had heard testimony and received evidence prepared a report for the full Council. That report was filed on August 25, 1978 and incorporated many of the suggestions of the Division's evaluation. The full Council met on September 25, 1978 and, with minor modifications, adopted the report.
While these proceedings had been proceeding, North Jersey made an application to the chairman of the H.S.C. for authorization to encroach on an historic site (the Great Falls and adjacent district). The facts relating to the Commissioner's final approval of the encroachment are set out in detail in Part III of this opinion.
On February 23, 1979 the Commissioner endorsed the Council's decision, approving the application of North Jersey and Hackensack and authorized the encroachment of the Great Falls. *189 The Council forwarded a copy of the conditional approval to each applicant on March 12, 1979. The applicants were given 90 days within which to accept the conditional approval. North Jersey accepted on March 21, 1979 and Hackensack did so on April 16, 1979. Based upon the Division's evaluation, the subscription to the project was limited in order to keep within the expected safe yield of the project.
The Commissioner considered the testimony entered by Paterson concerning the possible harmful effects of the project to the aesthetic value of the Great Falls and its relationship to the historic district. He also considered the project's impact on the hydroelectric facility contemplated by Paterson. While acknowledging that the project would have an impact on both the Falls and the facility, the Commissioner nonetheless determined that the public need for the increased water supply outweighed these considerations.

I
Paterson begins by raising several procedural issues concerning the hearings below. It argues that unfair procedures permeated the hearings so as to destroy the presumption of validity normally given to agency decisions.
Paterson attempts to illustrate what it sees as the fundamentally unfair nature of the proceedings before the Council with a letter from Governor Byrne to the Council chairman in which the Governor expressed concern over the "lengthy period" being consumed by the hearings for the Two Bridges-Ramapo project. The Governor further noted in this letter the necessity of developing alternative water sources such as Two Bridges in light of his rejection of the proposed construction of the Tocks Island Dam. Paterson contends that this letter represents the introduction of pressure politics into the quasi-judicial administrative hearings and was nothing more than a thinly-concealed direction to approve the project.
Considering that the Council issued its decision almost two years after this letter was written, it is doubtful that the letter *190 had much, if any, influence on the final decision. Furthermore, the Governor stated in his letter that he wanted a decision so he would know if "the potential water supplies of this diversion will be available or whether other alternatives will have to be explored." (Emphasis added).

A
Paterson argues that the Council decision is a nullity as none of the Council members heard all the evidence.
There were a total of 59 hearings over a period of approximately four years before the Council. Paterson has compiled statistics taken from the transcripts of the meetings. These statistics show that a total of 17 different Council members heard the evidence and only four attended over half of the meetings. No one attended all of the meetings.
After the conclusion of the hearings the Council designated six of its members to prepare a report. This six-member panel issued a report, including findings of fact and recommendations, on August 25, 1978. The report made numerous references to the transcripts of the proceedings and exhibits introduced at the proceedings. The full Council made a few modifications in this report and issued the formal approval of the application on September 25, 1978.
Paterson contends that this poor attendance record of the Council members and the panel report procedure violated fundamental considerations of procedural due process. The cornerstone of this argument is the first Morgan case in which the United States Supreme Court held that in administrative proceedings, as in judicial proceedings, "the one who decides must hear." Morgan v. United States, 298 U.S. 468, 481, 56 S.Ct. 906, 912, 80 L.Ed. 1288 (1936). Paterson finds further support for this argument in Asbury Park v. Civil Service Dep't, 17 N.J. 419 (1955). There, the Court, in an opinion by Justice Brennan, struck down an agency determination where part of the testimony was heard by one member and part by two other members:
No one would doubt the invalidity of a jury verdict if half the jury heard only the plaintiff's witnesses and the other half heard only the testimony on behalf of *191 the defendant. Fair play is plainly denied to litigants when a trier of fact who has not heard and evaluated all the testimony influences the decision by his participation in the deliberations by which it is reached. [at 423]
However, New Jersey cases and the United States Supreme Court in the first Morgan case have made it apparent that the absolutist approach urged by Paterson, that the same members must attend all the hearings and then only those members could render the decision, is not necessary to fulfill the requirements of procedural due process.
It is clear that the United States Supreme Court did not intend a strict literal interpretation of the phrase "the one who decides must hear." See Fifth St. Pier Corp. v. Hoboken, 22 N.J. 326, 333 (1956). After enunciating that phrase, the Morgan court further stated:
Evidence may be taken by an examiner. Evidence thus taken may be sifted and analyzed by competent subordinates ... [T]he officer who makes the determinations must consider and appraise the evidence which justifies them. [298 U.S. at 481-482, 56 S.Ct. at 912]
New Jersey courts have upheld administrative decisions where testimony was not actually heard by all members of the decision-making body. Fifth St. Pier Corp., above; In re Shelton College, 109 N.J. Super. 488 (App.Div. 1970).
In Shelton this court allowed the Board of Higher Education to conduct hearings with less than a quorum. The transcript and exhibits would then be provided to all members of the board so a decision could be made. The court went on to state: "It is generally held that the requisites of an administrative fair hearing are satisfied so long as one who participates in the ultimate decision reads and considers all of the evidence presented." 109 N.J. Super. at 492.
Our Supreme Court approved a panel procedure in Fifth St. Pier Corp. v. Hoboken, above. There, R.S. 54:2-18 specifically provided for the panel procedure in cases before the former Division of Tax Appeals. The court found that due process is satisfied by having two members of the decisional body summarize the critical factual contentions for the deciding body. In reaching this decision the court proceeded on the premise that the Division members, other than the panel members, were *192 probably not familiar with the 2,500-page transcript involved in the case. The court allowed the Division to rest its decision solely on the panel report.
The court conditioned its decision in Fifth St. Pier Corp. with the requirement that litigants be allowed to file exceptions to such a panel report. This allows the litigants "to make an impressionable contact with the powers of decision" (22 N.J. at 337) and in effect corrects any due process deficiencies that might exist by allowing an administrative decision to be based on a panel report.
The panel procedure employed by the Council in these water diversion hearings did not deprive Paterson of any procedural due process rights, nor did it violate the statutory requirements concerning hearings before the Water Policy Council.
The Two Bridges hearings took 59 hearing days over a period of four years and produced over 9,000 pages of transcript. Designating six members to read and digest the testimony provided a practical means of handling the massive amount of information presented to the Council. Paterson complains that the 11-member Council was only provided with an original and one copy of the transcript, contrary to the provisions of N.J.S.A. 58:1-8 which requires that each member be provided with a copy of the transcript. We find that strict compliance with the terms of N.J.S.A. 58:1-8 would be extremely impractical and would serve no purpose here. Indeed the parties agreed in a preargument conference in this appeal to provide only one copy of the transcript to us. As in Fifth St. Pier Corp., above, we must recognize that even had a transcript been made available to each Council member, it is doubtful that each member would have taken time to become fully acquainted with the testimony. Reliance would still have been placed on the panel report.
The panel report included numerous references to the transcripts. The parties were allowed to and did file exceptions to the report. We find that due process was met.
Nor do we find that the procedure employed violated the applicable statutes. N.J.S.A. 58:1-2 et seq. Each case must *193 be viewed in light of the particular statutory requirements providing for an administrative hearing. For example, in Asbury Park v. Civil Service Dep't, above, 17 N.J. at 422 it was noted that "this statute is not like some under which one or more of the members of a commission or board merely take the testimony and the determination is made by the full body upon report of those members." In In re Shelton College, above, 109 N.J. Super. 488, we noted that the panel procedure used by the Board of Higher Education did not conflict with the enabling statute. N.J.S.A. 18A:3-16 gave the board broad powers requisite to the performance of its duties.
Paterson argues that N.J.S.A. 58:1-2 et seq. does not provide for the specific procedure employed by the Council in this instance and thus the Council cannot appoint a six-member panel to make findings of fact. However, we note that the statute does not specifically prohibit the procedure. N.J.S.A. 58:1-8 permits hearings to be conducted by one or more members and then to have the entire Council act on the application. We think that report is a practical means by which the member who heard the testimony can summarize and present the facts to the full Council. In this case a panel report was unquestionably necessary. Without it the Council would have been unable to digest four years of testimony.

B
Paterson argues that the Council improperly relied on RS-1, the environmental evaluation prepared by the Division of Water Resources of the Department of Environmental Protection, and that RS-1 was presented in such a way so as to deprive Paterson of the opportunity to challenge it.
Paterson argues that RS-1 is, in effect, a brand new application replacing the one put forth by the applicants. We find nothing in the record to support such a contention. RS-1 obviously was an environmental impact report of the proposed project containing suggested modifications.
*194 As pointed out by North Jersey and Hackensack, RS-1 is an example of the prudent use of the expertise of the Division of Water Resources by the Council and all parties were given an adequate opportunity to examine the State's witnesses concerning it. (The examination and cross-examination of Mr. Lubow, the State's expert, took over two hearing days and produced over 400 pages of transcript.) The Council's final approval made changes in the Division's recommendations, notably rejecting the Division's recommendation involving aesthetic augmentation of the Falls. The Council weighed the testimony, including the Division's evaluation, and acted to preserve the watershed while at the same time permitting much needed water supplies to flow to northern New Jersey.

C
Paterson argues that the Council acted improperly in approving Monksville. Paterson does not itself oppose Monksville but rather claims that anomalies in the Council's decision casts doubt on the viability of the entire Two Bridges-Ramapo proposal.
Paterson claims a lack of notice with regards to Monksville. However, Chairman Schwartz clearly indicated at the first hearing on the amended application that "This will be a continuation of the hearing held on July 22, 1974 and all testimony previously entered will be considered as in this case."
The decision to approve Monksville was within the reasoned discretion of the Council. That exercise of discretion will not be disturbed absent a showing that the agency determination so departs from the record as to become arbitrary, capricious or unreasonable. In re Application of Hackensack Water Co., 88 N.J. Super. 362, 369 (App.Div. 1965).
Paterson argues that the underlying reasons for the approval are unclear, and asks the court to exercise its original jurisdiction, N.J. Const. (1947), Art. VI, § V, par. 3; R. 2:10-5, to determine whether Two Bridges is viable without Monksville.
*195 We find no necessity to make an independent determination on the Monksville approval. The Council gave a conditional approval to Monksville as it was unable to determine exactly what effect the Council-imposed restrictions on Two Bridges would have on the project yield. Future engineering studies will be made. We find that this decision was neither arbitrary nor unreasonable based on the facts then before the Council.
Paterson also argues that Hackensack is now being forced to accept a project it does not want. This is not accurate. Hackensack opposed Monksville because it wished to be included in any project involving the development of the Ramapo River. Furthermore, Monksville is not being forced on anyone. The approval signed by the applicants states that "if the applicants find that the project yield of 79 mgd cannot be achieved hereunder, the proposed Monksville Reservoir may be constructed, pursuant to N.J.S.A. 58:4-1 et seq."

D
Paterson argues that the representation of both the Department of Environmental Protection and the Council by the Attorney General's Office deprived Paterson of an opportunity for a fair hearing. We do not agree.
Paterson was fully represented at the hearing and had full opportunity to object to what it saw as any irregularities in the hearings. Paterson points to no explicit statutory or case law prohibiting the practice employed here. The Water Council and Department of Environmental Protection were not adversaries in this hearing. The decision of the Attorney General to provide representation to both was not invalid. Cf. State Health Plan. and Coord. Council v. Hyland, 161 N.J. Super. 468 (App.Div. 1978) (it was proper for the Attorney General to decline to represent the appellant agency since he already represented the Commissioner of Health, an opposing party, at the same hearing). The Attorney General had discretion in choosing when and where to provide representation, Alexander v. N.J. *196 Power & Light Co., 21 N.J. 373, 380 (1956), and his decision will not be disturbed absent a showing that it was arbitrary, capricious or unreasonable. State Health Plan. and Coord. Council v. Hyland, above, 161 N.J. Super. at 476.

II
The Council is charged with the "general supervision over all sources of potable and public water supplies." N.J.S.A. 58:1-10. It supervises all sources of potable and public water supplies, including surface, subsurface and public waters to "the end that the same may be economically and prudently developed for public use." N.J.S.A. 58:1-10. The Council is specifically required by statute to review and approve plans to divert water for any new or additional source of water supply as submitted by any "municipal corporation or other civil division of the state." N.J.S.A. 58:1-17. Such review is conducted for the purpose of determining:
... whether the plans proposed are justified by public necessity, whether they provide for the proper and safe construction of all works connected therewith, whether they provide for the proper protection of the supply and the watershed from contamination or provide for the proper filtration of such additional supply, whether the reduction of the dry-season flow of any stream will be caused to an amount likely to produce insanitary conditions or otherwise unduly injure public or private interests, and whether the plans are just and equitable to the other municipalities and civil divisions of the state affected thereby and to the inhabitants thereof, particular consideration being given to their present and future necessities for sources of water supply. [N.J.S.A. 58:1-20]
Paterson and Passaic Valley contend that the Council ignored crucial evidence in making its decision to grant approval to the project and lacked a substantial credible basis upon which to rest its determination. Paterson cites the "hasty" elimination of three municipalities from the list of subscribers, the rejection of viable alternatives, the "glossing over" of significant revelations on ammonia content, the failure to assess water quality impacts and the lack of demonstrated need for the project as examples of the Council's flagrant abuse of administrative discretion in approving the defendants' application.
*197 The Council is presumed to have achieved a high degree of expertise in the field of water supply. Ararat, Inc. v. Environmental Protection Dep't., 132 N.J. Super. 305, 312 (App. Div. 1975), certif. den. 68 N.J. 157 (1975). As the Supreme Court stated in Juzek v. Hackensack Water Co., 48 N.J. 302, 310-311 (1966): "... the Water Council and its agents have developed a singular expertise and are unusually qualified to pass judgment on such subject."
In reviewing administrative findings we are limited to ascertaining whether the agency decision is based on sufficient credible evidence in the record as a whole. Only where the determination of the agency so departs from the record as to become arbitrary, capricious or unreasonable should an appellate court step in to make its own determinations. In re Application of Hackensack Water Co., above, 88 N.J. Super. at 369.
Both Paterson and Passaic Valley present a substantial amount of material concerning the alleged deleterious environmental effects of the project and point to recent declining populations in the cities to be served as proof that a public need for such a project is lacking. The Council, however, based its decision to approve the joint application of Hackensack and North Jersey on a detailed report made by a six-member panel which heard testimony and received evidence from the parties involved. That report deals at length with the public necessity for such a project, the qualitative and quantitative impact of the project, the proper method of construction and the equities of such a project. Subject to certain provisions which were clearly set forth in its report, the six-member panel recommended approval of the project. The report was submitted August 25, 1978 and amended on September 25, 1978. On September 25, 1978 the Council approved the joint application. The Council specifically stated that it found that the proposed plans, after hearing and examination, were justified by public necessity, provided for proper and safe construction and protection of water supply from contamination and that such plans were just and equitable to surrounding municipalities.
*198 The Council is required by statute to exercise its discretion and to apply its understanding of water supply matters to technical problems. N.J.S.A. 58:1-20. Here, it exercised its discretion in approving the project with modifications designed to limit subscription within the expected safe yield of the project and to safeguard the watershed from contamination. In the context of the record of the evidence and testimony made available to the six-member panel and subsequently to the Council itself, there is no reason to believe that its decision was based upon incomplete or incompetent evidence. If the findings could reasonably have been reached on sufficient credible evidence presented in the record, they should not be disturbed on appeal. In re Tenure Hearing of Grossman, 127 N.J. Super. 13, 23 (App.Div. 1974), certif. den. 65 N.J. 292 (1974); St. Vincent's Hospital v. Finley, 154 N.J. Super. 24, 30 (App.Div. 1977). In its report granting approval of the application the Council stated clearly the bases for its decision. We note that one of the "hasty" and "arbitrary" decisions Paterson complains of in its brief, the elimination of three municipalities from the list of subscribers, was made because their subscriptions would have exceeded the projected safe water yield and, further, that those municipalities have alternative sources of supply. The Council thus clearly took account of the qualitative and quantitative impact of the project, an issue Paterson uses in its attack on the plan. In addition, the panel received and considered various alternatives to the proposed project and rejected them in favor of the present plan. There is nothing in the record to indicate that the panel's decision and the Council's subsequent determination based on the panel report was defective as being unreasonable or arbitrary. New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 563 (1978).
Thus, considering the volume of evidence and the issues presented, the determination made by the Council of technical matters which fall within its area of expertise should be given judicial deference. We find sufficient evidence in the record to warrant the Council's approval of the project.

*199 III
Paterson maintains that the proposed project will have an adverse impact on the Great Falls and the adjacent district which have been designated as an historic site. The State Register Law, N.J.S.A. 13:1B-15.128 to 15.132, provides in part:
The State ... or [any] agency or instrumentality... thereof shall not undertake any project which will encroach upon, damage or destroy any area, site... or object included in the Register of Historic Places without application to, and the prior written authorization or consent of, the Commissioner of Environmental Protection. The commissioner shall solicit the advice and recommendations of the Historic Sites Council in connection with any such application and may direct the conduct of a public hearing or hearings thereon prior to granting or denying authorization or consent.... [N.J.S.A. 13:1B-15.131; emphasis supplied]
Paterson maintains that North Jersey consistently disregarded the mandatory provisions of the State Register Law in that it failed to make proper application to the Commissioner for permission to encroach on an historic site. Paterson further contends that the Commissioner's failure to hold a hearing in accordance with the Administrative Procedure Act denied it due process and mandates that the matter be remanded for an impartial hearing. The city argues that the standards guiding the authorization of the encroachment were ignored.
Since the North Jersey District Water Supply Commission is a "public body politic and corporate established as an instrumentality exercising public and ... governmental functions," (N.J.S.A. 58:5-35), it represents an agency or instrumentality of the State subject to the provisions of N.J.S.A. 13:1B-15.131. North Jersey was therefore obligated to obtain the approval of the Commissioner before undertaking any project that would have the effect of encroaching upon the Great Falls Historic District and the Great Falls, by virtue of any diminution in the flow of water over the Falls.
In recommending to the Council that defendants' application be approved, the August 25, 1978 report of the six-member panel took note of the fact that the Commissioner, in accordance with N.J.S.A. 13:1B-15.128 et seq., must make the final decision on the recommendations made in March 1977 by the Historic Sites *200 Council. Commissioner O'Hern permitted the encroachment upon the Great Falls "to the limited degree necessitated by approval of these applications." In doing so the Commissioner recognized that these applications presented difficult questions concerning the need for an adequate public water supply and the need to maintain the aesthetic value of the Great Falls. The conditions he attached to the approval of the applications represented "a reasoned attempt to resolve the conflict and satisfy both concerns." Defendants contend that the Commissioner thus properly received and acted upon the recommendations of the Historic Sites Council.
On December 18, 1975 the Director of the Great Falls Historic District sent a letter to the State Historic Site Office indicating that Paterson opposed the project because it "would seriously interfere with the flow over the Great Falls at Paterson, and through the S.U.M.[2] raceway system, a registered landmark on both the Federal and State registers." The Director alleged that the applicants' environmental assessment indicated that there would be an effect on river flow and enclosed copies of the assessment, Paterson's objections before the Council and a fact sheet set up in a question and answer format.
During January 1976, after Paterson placed its interpretation of N.J.S.A. 13:1B-15.128 et seq. before the Council, the Council issued a series of questions concerning the effect of the project on flows in the Passaic River upstream of the Great Falls. The purpose of those questions was to insure that the Commissioner of the Department of Environmental Protection had adequate information in order that he could act in his capacity as State Historic Sites Officer. N.J.S.A. 13:1B-15.131. Briefly, all questions directed to Paterson dealt with the possible effect of the Two Bridges diversion of the Falls, the hydroplant and the S.U.M. Historic District. Paterson, North Jersey and Hackensack answered the questions.
*201 On January 27, 1976 North Jersey's attorney sent a letter to the Commissioner inquiring whether the Great Falls had been designated as an historic site under N.J.S.A. 13:1B-15.128. The letter also inquired if there was any specific form of application required by the Department of Environmental Protection pursuant to N.J.S.A. 13:1B-15.131, and requested instructions or recommendations the Commissioner deemed germane to the situation.
David Poinsett, a project reviewer for the Office of Environmental Review, was requested by Messrs. Schmidt and Lubow of the D.E.P. to examine the Two Bridges-Ramapo diversion's effect on the Great Falls and S.U.M. Historic District. Poinsett has been with the State Historic Preservation Program for ten years and was the State Supervisor of Historic Sites from 1969 to 1976. We are informed that any extensive investigation or review prior to the Historic Sites Council making a finding or recommendation to the Commissioner is usually made by a staff member.
Poinsett spent several days reviewing files and documents, including environmental assessments and fact sheets prepared by the applicants, numerous photographs, the questions answered by Paterson and transcripts of the Council hearings. Briefly, Poinsett determined that the proposed project would have no effect on the current use of the S.U.M. Raceway System, would have a definite effect on the aesthetic value of the Falls based on the fact that he believed the Niagara principle was accurate for the Passaic Falls, and based on available photographic evidence he also determined that the project would have no effect on the hydroelectric plant under then current conditions. Both North Jersey and Hackensack noted that they disagreed with the conclusions reached by Poinsett. However, it is nonetheless clear that he did study the possible effects of the project on the historic site and made his determinations based on a substantial amount of testimony and evidence.
After a series of communications between the parties involved, the Chief of the Office of Environmental Assessment advised the Chief Engineer of North Jersey that North Jersey *202 should file an application with the Historic Sites Council regarding permission for an encroachment. The Acting Supervisor of Historic Sites advised Paterson's attorney on October 6, 1976 that no application had yet been made and that appropriate action would be taken upon receipt of such an application by North Jersey.
On November 17, 1976, having been informed a second time of the necessity of applying to the H.S.C. for permission to encroach and not having received a formal reply to its letter of January 27, 1976 to the Commissioner requesting his recommendations, North Jersey filed an application to the H.S.C. by a letter to its chairman.
At its meeting of March 10, 1977 the H.S.C. discussed the Two Bridges project and approval was made for encroachment of the Site. The addendum to the minutes clearly states the decision of the H.S.C. with regard to the Great Falls and the limitations on the project which were deemed necessary to preserve the character of the Falls.
On May 5, 1977 letters were sent to the attorneys of North Jersey and Paterson informing them of the H.S.C. decision of March 10, 1077. The Council noted the H.S.C.'s determination in its report to the Commissioner while specifically reserving decision on that matter for the Commissioner. The Commissioner's order of February 23, 1979 indicates that he carried out his statutory duty in weighing the effect of any encroachment by the proposed project on the historical site.
Paterson challenges the encroachment authorization as being procedurally defective. Initially, Paterson maintains that the Commissioner failed to conduct a hearing on the issue as required by the Administrative Procedure Act, N.J.S.A. 52:14B-1 et seq.
N.J.S.A. 52:14B-9(a) provides for a hearing in contested cases after reasonable notice. N.J.S.A. 52:14B-2(b) defines a contested case as:
... a proceeding, including any licensing proceeding, in which the legal rights, duties, obligations, privileges, benefits or other legal relations of specific parties are required by constitutional right or by statute to be determined by an *203 agency by decisions, determinations, or orders, addressed to them or disposing of their interests, after opportunity for an agency hearing.
The Administrative Procedure Act is thus a statutory description of the procedural safeguards which must be observed by an agency when the underlying statute or due process of law requires a hearing to be held prior to a determination being made. Public Interest Research Group v. State, 152 N.J. Super. 191, 205 (App.Div. 1977), certif. den. 75 N.J. 538 (1977).
N.J.S.A. 13:1B-15.131, which outlines the procedures to be followed when any project is undertaken which will encroach upon an historic site provides that "the Commissioner ... may direct the conduct of a public hearing or hearings" on the historic site encroachment "prior to granting or denying authorization or consent." (Emphasis added). Clearly, the Commissioner may use his discretion in deciding whether or not to hold a hearing. We also note that the Commissioner's failure to authorize or deny an encroachment application within 120 days after the application is filed constitutes the Commissioner's consent or authorization thereof. If a mandatory hearing were to be read into the statute, it would be inconsistent to permit such a de facto approval after a designated length of time has elapsed. The Commissioner's decision approving the project indicates that he was indeed sensitive to the historical and cultural values of the Great Falls and weighed them against the public need for the project. It is also clear from the record available that expert testimony and evaluations with regard to the encroachment were available to the Council and the Commissioner.
We are not persuaded that the plaintiffs have a constitutional right to an adversarial hearing in regard to this encroachment. A party must have "`particularized property rights or other special interests' which can be affected by the administrative determination" in order to be entitled to a true adversary hearing on a constitutional due process basis. Public Interest Research Group v. State, above, 152 N.J. Super. at 205-206; Cunningham v. Civil Service Dep't, 69 N.J. 13, 22 (1975). The Court in Cunningham also stated that a hearing is *204 not required when an agency is receiving general facts which will help it decide questions of law, policy and discretion. 69 N.J. at 22.
The Register Law seeks to preserve historic sites for the benefit of the public. Thus, when the Commissioner acted to authorize an encroachment he was doing so in a general capacity that will affect all individuals capable of deriving benefits from the historical, architectural and cultural values of the Great Falls and the adjacent district. An adversarial judicial-type meeting was not required.
We find the argument that North Jersey's letter application to the chairman of the H.S.C. rather than directly to the Commissioner renders such application defective to be without merit. Although perhaps technically correct, such an argument needlessly places form over substance, particularly in view of the fact that the statutory scheme provides for the Commissioner to seek the advice and recommendations of the H.S.C prior to making a decision. N.J.S.A. 13:1B-15.131.
Furthermore, despite the fact that statutory rules of procedure have not been promulgated with regard to encroachment applications, the statutory provisions, as noted above, authorize the Commissioner to permit an encroachment upon an historic site by taking no action at all on an application. N.J.S.A. 13:1B-15.131. The purpose of the procedures enumerated in the statute is to bring before the Commissioner such information as will enable him to exercise an informed judgment. This result was accomplished by the various reports of D.E.P. personnel and the H.S.C., as well as material submitted by the attorneys for the City of Paterson. Standards need not be set forth in express terms if they may reasonably be inferred from the statutory scheme as a whole. In re Bernaducci, 85 N.J. Super. 152, 155 (App.Div. 1964), certif. den. 44 N.J. 402 (1965). The entire enactment must be viewed in light of the objectives to be served in deciding whether there are sufficient standards. In re Bernaducci, above, 85 N.J. Super. at 156; Henderson v. Board of Exam'rs of Elec. Cont'rs, 85 N.J. Super. 509, 514 (App.Div. 1964), certif. den. 44 N.J. 399 (1965).
*205 We find there was a record for the Commissioner's review which included the findings of the six-member panel of the Council, the report of the Council itself, as well as material submitted by Paterson and developed by the D.E.P. staff personnel for the H.S.C. The Commissioner weighed the conflicting interests before him and determined that encroachment on the Great Falls and the adjacent district was necessary in order to satisfy the need for an increased public water supply.
Finally, Paterson also contends that the Council and the H.S.C. are two distinct agencies with separate functions which must of necessity be guided by separate standards. Thus, they maintain that the approval of the site encroachment is somehow defective. In view of the fact that the record reveals that the H.S.C. and Council made separate determinations with respect to the feasibility of the project and that the six-member panel deferred to the judgment of the H.S.C. and the Commissioner with respect to the historic site encroachment, this argument is unpersuasive. Even if the evidence reviewed by the H.S.C. and the Council were similar or identical, there is no indication that either body subjected its standards to those of the other in making its final determinations. Rather, the evidence is to the contrary, revealing a consideration of all relevant economic, historical and cultural factors.

IV
Paterson and Passaic Valley argue that the agreement between North Jersey and Hackensack is prohibited by New Jersey law and Constitution. It is claimed it constitutes an illegal joint venture between a public entity and a private corporation.
They first argue that North Jersey's agreement with a private corporation is an illicit sharing of delegated power. It is claimed that the agreement represents an unauthorized subdelegation of powers delegated to North Jersey by the State Legislature.
*206 Under our law "a power or duty delegated by statute to an administrative agency cannot be subdelegated in the absence of any indication that the Legislature so intends." Mercer Council #4, N.J. Civ. Serv. v. Alloway, 119 N.J. Super. 94, 99 (App.Div. 1972), aff'd 61 N.J. 516 (1972). This is especially true when the agency attempts to subdelegate to a private person or entity, since such person or entity is not subject to public accountability. N.J. Dept. of Transp. v. Brzoska, 139 N.J. Super. 510 (App.Div. 1976).
The facts do not support the subdelegation argument. North Jersey is not delegating power: it is sharing ownership. The core agreement between North Jersey and Hackensack provides that North Jersey is to be the sole operating agent of the Two Bridges project. That understanding satisfies the requirement of N.J.S.A. 58:5-24 that North Jersey is to have "sole control and charge" of a completed water supply system. North Jersey does not relinquish or delegate any of its statutory powers.
Paterson and Passaic Valley also argue that the planned joint venture violates N.J. Const. (1947) Art. VIII, § III, pars. 2 and 3. They provide:
Par. 2 No county, city, borough, town, township or village shall hereafter [viz. after the amendment of September 28, 1875] give any money or property, or loan its money or credit, to or in aid of any individual, association or corporation, or become security for, or be directly or indirectly the owner of, any stock or bonds of any association or corporation.
Par. 3 No donation of land or appropriation of money shall be made by the State or any county or municipal corporation to or for the use of any society, association or corporation whatever.
These sections were enacted in 1875 as a response to widespread abuses in government financing of the railroad industry. Roe v. Kervick, 42 N.J. 191, 206-207 (1964); Bayonne v. Palmer, 90 N.J. Super. 245, 269-272 (Ch.Div. 1966), aff'd 47 N.J. 520 (1966). Paterson and Passaic Valley argue that the provisions should be applied to prohibit this joint venture between Hackensack and North Jersey. We do not agree.
Paterson and Passaic Valley cite a line of Ohio cases beginning with Alter v. Cincinnati, 56 Ohio St. 47, 46 N.E. 69 *207 (Sup.Ct. 1897), in support of their argument. In Alter the Ohio court found that a constitutional provision similar to ours barred an arrangement under which a city would own part of the waterworks and a private company would own the balance. The court stated: "There can be no union of public and private funds or credit, nor of that which is produced by such funds or credit. The whole ownership and control must be in the public." 46 N.E. at 70. Ohio courts have reiterated this principle several times. See, e.g., Cincinnati v. Harth, 13 Ohio App. 81, affirmed 128 N.E. 263, 101 Ohio St. 344 (Ct.App. 1920); State ex rel. Wilson v. Hance, 169 Ohio St. 457, 159 N.E.2d 741 (Sup.Ct. 1959); State ex rel. Eichenberger v. Neff, 42 Ohio App.2d 69, 330 N.E.2d 454 (Ct.App. 1977).
However, we are not cited to any New Jersey cases in support of the principle expressed in Alter. Nor have any cases directly on point been found. Actually in Whelan v. N.J. Power & Light Co., 45 N.J. 237 (1965), which did not rule directly on the issue of a joint enterprise between a public and private entity, our Court did question the Ohio cases which barred such a joint venture.
Such cases seemingly mean that, however public the purpose and however defensible the use of public funds to achieve it through arrangements with private sources, still the arrangement may not take the form of a partnership or joint enterprise involving either a sharing of the underlying ownership or a sharing in the operating experience.
It is not immediately clear why this limitation should be found if the public expenditure does not otherwise offend the constitutional ban against the use of property or credit. Our Constitution does not say its prohibitions shall depend upon the form a transaction takes. [At 248]
New Jersey cases construing Art. VIII, § III, pars. 2 and 3, have refused to give those provisions a literal reading such as would tie the hands of government: "the amendments must be applied according to their essence, understood in light of the evil that led to their adoption." Whelan v. N.J. Power & Light Co., above, 45 N.J. at 247.
In Roe v. Kervick, above, 42 N.J. 191, the Supreme Court struck down a challenge, based on Article VIII, to the Area Redevelopment Assistance Act. That statute established a program whereby the Federal Government, the State and a municipality loaned moneys to finance redevelopment projects, privately *208 owned and operated for private profit, which would provide job opportunities in economically distressed areas. The Court found that this program implemented a public duty to relieve the poor. As such, Article VIII did not bar this statute. "The strictures of Article VIII which were adopted in 1875, were simply the retreat to a fundamental doctrine of government, i.e., that public money should be raised and used only for public purposes." 42 N.J. at 207.
The public purpose doctrine alone does not satisfy Article VIII. Wilentz v. Hendrickson, 133 N.J. Eq. 447 (Ch. 1943), aff'd 135 N.J. Eq. 244 (E. & A. 1944). It is clear that there must be consideration between the State and the private entity. Bayonne v. Palmer, above, 47 N.J. at 523.
These paragraphs do not "bar the State or its agencies from discharging their public duties through the medium of contracts with private entrepreneurs." Whelan, above, 45 N.J. at 246 Thus, in Runnemede v. New Jersey Water Co., 123 N.J.L. 383 (E. & A. 1939), the court upheld a municipality's contract with a private water company to secure an additional water supply; there was found adequate consideration (benefit to the municipality) and that the contract fulfilled a public purpose.
If North Jersey needed to supplement its water supply in a dry year and contracted with Hackensack for the purchase of water, such a contract would clearly be valid under the constitutional provisions in question. It makes no sense to prevent North Jersey from doing by joint venture what it clearly is permitted to do by contract  increase its water supply through an agreement with a private water company.
There is a clear public purpose in this project, namely, to provide water for the people of northern New Jersey. Furthermore, this is not a free loan from North Jersey to Hackensack. Each entity is to finance its own portion of the project.
One last consideration on the constitutional issue is that Hackensack is a public utility and as such is subject to special *209 regulation by the State beyond that imposed on private corporations generally. Van Riper v. Traffic Tel. Workers' Fed. of N.J., 2 N.J. 335, 345 (1949). A joint venture with a regulated public utility is a far cry from the railroad cases of the 19th Century in which government money was lent or given to the then unregulated railroads. In the latter cases government money could, and many times did, disappear. It is doubtful that the present joint venture can lead to that kind of abuse.
Paterson and Passaic Valley argue that the Legislature did not intend to allow the joint venture in question here. However, an examination of N.J.S.A. 58:5-1 et seq. reveals that the opposite is true.
Specifically regarding the acquisition of water and the construction of facilities, North Jersey has the authority to:
... acquire by purchase or condemnation any part .. . of the water plant, water rights, easements, distribution system or other property of any existing private corporation or of any water company, including any contracts which said corporation or water company may have with any municipal or other corporation for the supply of water and may carry out said contracts; [N.J.S.A. 58:5-16; emphasis supplied]
Moreover, North Jersey may:
... construct or cause to be constructed such reservoirs, pipe lines, mains, pumping or filtration plant, standpipes, tunnels, buildings or other structures, machinery and appliances as may be necessary for the purposes of this chapter, and may hire all employees and purchase all materials necessary for such purpose, and shall have all other powers necessary or proper to provide all of the contracting municipalities in the water supply district with a sufficient water supply, including the right to contract with any municipality, corporation, person or other district water supply commission for the purchase, sale or exchange of any water, lands or other property. ... [N.J.S.A. 58:5-16; emphasis supplied]
Furthermore, N.J.S.A. 58:5-7 constitutes North Jersey:
... a body corporate with ... the right to acquire hold, use, lease and dispose of all such property as may be necessary for the uses and purposes for which the commission was created, and with all other necessary powers incident to corporate bodies.
This incorporates by reference all powers given to corporate bodies. State v. North Jersey Dist. Water Supply Comm'n, 127 N.J. Super. 251, 268 (App.Div. 1974), certif. den. 65 N.J. 578 (1974), cert. den. sub nom. Passaic Valley Water Comm'n v. New Jersey, 419 U.S. 999, 95 S.Ct. 314, 42 L.Ed.2d 273 (1974). *210 N.J.S.A. 14A:3-1(1)(m) gives a corporation "power" "to participate with others in any corporation, partnership, limited partnership, joint venture or other association of any kind ..." (Emphasis supplied).
Paterson and Passaic Valley raise what they see as a number of practical difficulties barring the joint venture. However, the agreement between North Jersey and Hackensack meets many of these problems.
Specifically, the core agreement provides for separate financing thus allowing North Jersey to enjoy the advantages of public funding. N.J.S.A. 58:5-43 et seq. Hackensack has also acknowledged North Jersey's responsibility to engage in public bidding.
In its brief Passaic Valley paints a picture of the proposed relationship as that of a private entity running amok over the interests of a public entity. The doomsday scenario is pure speculation. As a public utility Hackensack has a responsibility to the general public no less than that of North Jersey. The proposed arrangement provides adequate safeguards to protect North Jersey, and North Jersey is content with that arrangement. We see no reason either constitutional or statutory to strike it down.

V
Paterson argues that newly discovered evidence showing that the cost of the project is nearly 400% above what was testified to before the Council warrants a de novo review of the project. We comment on this argument briefly although we deem it irrelevant to the issues involved here.
The "newly discovered evidence" is an application for financial assistance filed February 8, 1979 by Hackensack with the New Jersey Economic Development Authority.
An examination of that application shows that the facts are not as stated by Paterson. The application does not show a 400% increase in the cost of the Two Bridges-Ramapo project. Rather, it is an application for financial assistance for four *211 projects, one of which is Two Bridges-Ramapo. The other three projects are: (a) expansion of the existing Hackensack Water Company Haworth Filtration Plant, (b) renovation of the Hackensack New Milford Filtration Plant and Pumping Station and (c) expansion of the Treated Water Transmission System.
The Council had before it testimony that the costs of these tangential projects were not included in the Two Bridges-Ramapo application. Thus, the projects listed in the application for financial assistance were not new evidence. The project cost of Two Bridges-Ramapo has not increased 400%. There is no justification for a de novo hearing.
The City of Elizabeth, Town of Nutley and Township of Wayne appeal from that part of the Commissioner's decision denying their applications for participation in the Two Bridges-Ramapo project.
The Council was faced with the situation where the applications for participation in the project exceeded the projected safe yield. The Council could not grant all of the applications before it. Based on the facts before the Council, a decision was made that Elizabeth, Wayne and Nutley did not demonstrate a need for the proposed supply. Passaic Valley has indicated a willingness to continue to supply Nutley; Wayne has recently entered into a contract with Passaic Valley which is adequate for its needs, and Elizabeth could not estimate the quantity of water needed for the new high school and industrial area. Furthermore, the Elizabeth-town Water Co. was available as an alternative source of supply.
An agency factual determination will not be set aside if supported by substantial evidence in the record. In re Plainfield-Union Water Co., 14 N.J. 296, 308 (1954); In re Application of Hackensack Water Co., 88 N.J. Super. 362 (App. Div. 1965). An examination of the record here shows that it contains sufficient credible evidence to support the Commissioner's decision and that the decision is not arbitrary, capricious or unreasonable. In fact, the decision was necessary. The proposed diversion was oversubscribed. Someone had to be eliminated. *212 The Council made a reasoned decision to eliminate Nutley, Wayne and Elizabeth based on the fact that they had alternative sources of water while the other municipalities did not.
Affirmed.
NOTES
[1] The proceedings produced 9,216 pages of testimony and 233 exhibits.
[2] Society for Establishing Useful Manufactures